**BRIAN J. FOLEY, Attorney at Law**
BY:    **BRIAN J. FOLEY, ESQ.** (PA ID No. 68806)
6701 Germantown Avenue, Suite 200
Philadelphia, PA  19119
(267) 930-4425 v
(267) 930-4427 f
*Attorney for Plaintiff Marilyn Gaye Piety Foley*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARILYN GAYE PIETY FOLEY** | : | |
| | : | |
| Plaintiff | : | |
| | : | **CIVIL ACTION NO. 25-2103** |
| v. | : | |
| | : | |
| **DREXEL UNIVERSITY** | : | |
| 3141 Chestnut Street, | : | |
| Philadelphia, PA 19104 | : | |
| | : | |
| and | : | |
| | : | |
| **DAVID S. BROWN** | : | |
| 3141 Chestnut Street, | : | |
| Philadelphia, PA 19104 | : | |
| | : | |
| and | : | |
| | : | |
| **ROGER KURTZ** | : | |
| 3141 Chestnut Street, | : | |
| Philadelphia, PA 19104 | : | |
| | : | : |
| and | : | |
| | : | |
| **JUHWON LEE** | : | |
| 3141 Chestnut Street, | : | |
| Philadelphia, PA 19104 | : | |
| | : | JURY TRIAL DEMANDED |
| Defendants | : | |

**COMPLAINT**

## PRELIMINARY STATEMENT

1.      *Retaliation can't wait.* Less than two weeks after Plaintiff defeated Drexel University at a jury trial and won a judgment of more than $350,000 by proving Drexel willfully violated the Equal Pay Act by paying several of her male colleagues who were doing substantially equal work more than her, Plaintiff was shocked to discover that Drexel was banishing her from campus: Drexel converted her upcoming Spring courses including an upper-level seminar from their original "face-to-face" to a remote "online-asynchronous" format without telling her.  To fight her way back onto campus, Dr. Piety, a world-famous scholar and highly rated teacher, was forced agree to teach introductory courses. When Dr. Piety asked why her courses had been changed, Drexel gave conflicting stories: the Philosophy Program Director claimed it was his mistake, and the Head of the Department of English and Philosophy said the Dean had ordered it.

2.      This harassment is part of Defendants' ongoing retaliation against Dr. Piety for exposing Drexel's illegal sex-based pay disparities in open court. *See Marilyn Gaye Piety Foley v. Drexel University*, 22-CV-1777 (EDPA). Drexel also attempted to renege on its promise to provide financial and promotional support for a joint Yale-Drexel conference Dr. Piety had organized, has denied her opportunities for advancement within the College of Arts and Sciences and has refused to promote Dr. Piety's accomplishments in routine "kudos" emails to her colleagues, including her recently being honored as the Keynote Speaker for an upcoming conference, her being invited to present a paper at Princeton University, and that a paper of hers was selected for presentation at the annual meeting of the American Academy of Religion conference. Drexel has also refused to raise Dr. Piety's salary despite the jury's verdict that Drexel's underpayment of her is willful discrimination.

3.       In retaliation for the lawsuit, Defendants are trying to marginalize, frustrate, and humiliate Dr. Piety -- and drive her to quit, despite that driving her out of Drexel would deprive students of a world-renowned scholar and effective teacher. Piety has taught at Drexel since 1998 and has been promoted through the ranks to tenured, full professor. She consistently receives strongly positive teaching evaluations from her students, consistently exceeds publication requirements for tenure-line faculty, and consistently provides outstanding service to Drexel and to her field. Drexel regularly gives her strongly positive annual performance reviews and has paid her a merit raise every year the raises were available. And unlike several members of her Department, Piety has never had a formal complaint filed against her by any colleagues. Dr. Piety is clearly an enormous asset to Drexel, yet without any defensible reasons to make her leave, Drexel has resorted to heavy-handed spiteful harassment to deprive her of and diminish the compensation, terms and conditions, and privileges of employment that she has earned in more than a quarter century of stellar performance at Drexel and in her field.

4.       Dr. Piety stands her ground and fights back with this action for an award of damages including punitive damages, compensatory damages, attorneys' fees, equitable relief, and all other available and appropriate relief. This action is brought under the anti-retaliation provision of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*., which protects employees who make complaints of violations of the Equal Pay Act, 29 U.S.C. § 206(d)(1), from any person who retaliates against them. 29 U.S.C. § 215(a)(3).

## JURISDICTION

5.       This Court has original jurisdiction over all civil actions arising under the Constitution, laws, or treaties of the United States pursuant to 28 U.S.C. §§ 1331, and the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*

**VENUE**

6.      This action properly lies in the Eastern District of Pennsylvania, pursuant to 28 U.S.C. § 1391(b), because the claims arose in this judicial district and Defendants conduct business here.

**PARTIES**

7.      Plaintiff, Marilyn Gaye Piety Foley (hereinafter "Dr. Piety," "Piety"), is an adult female citizen and resident of Philadelphia, Pennsylvania.

8.      Defendant Drexel University ("Drexel") is a private research university in Philadelphia, Pennsylvania, one of the 15 largest employers in the city, with more than 6,000 faculty and professional staff, and about 20,000 students.

9.      Defendant David S. Brown (Dean Brown, Dr. Brown) is an adult individual who is a Professor and the Dean of the College of Arts and Sciences of Defendant Drexel University and is one of Dr. Piety's supervisors.

10.      Defendant Roger Kurtz (J. Roger Kurtz, Dr. Kurtz) is an adult individual who is a Professor and the Department Head of the Department of English and Philosophy in the College of Arts and Sciences of Defendant Drexel University and is Dr. Piety's direct supervisor.

11.      Defendant JuHwon Lee is an adult individual who is Associate General Counsel and Chief, Litigation Services, at Defendant Drexel University.

12.      At all relevant times, Defendants acted and/or failed to act by and through their agents, servants, and employees, who were acting within the scope of their authority, course of employment, and/or agency with one or more of the Defendants.

## FACTS

### Retaliation Can't Wait: Drexel Changes Dr. Piety's Teaching Schedule to Banish Her From Campus

13.     Dr. Piety's teaching schedule covers the following quarterly terms: Fall, Spring, and Summer. Tenure-line professors generally take one term off to focus on scholarly research and writing, a required part of their job.  Dr. Piety takes off Winter instead of Summer.

14.     During the 2025 Winter term, Dr. Piety was looking forward to returning to campus to teach in the Spring term.  She was scheduled to teach two courses, an upper-level seminar called *Philosophy of Religion* (PHIL 391) and an entry level course called *Introduction to Philosophy* (PHIL 110).

15.     On February 11, 2025, less than two weeks after the jury verdict and judgment against Drexel, the Philosophy Program Director, Dr. Pete Amato, emailed philosophy faculty including Dr. Piety a list of course, saying, "Please share with students and advisees thanks!"  to promote these courses and increase enrollment.

16.     Dr. Piety read the email and saw that her seminar, *PHIL 391: Philosophy of Religion*, was included. To her shock, she saw it had been changed from "face-to-face" to "online-asynchronous," which meant she would have to completely revise it before the start of the spring term to make it suitable to teach remotely. The change was unusual as seminars are traditionally based on in-class discussion. It was also unprecedented in that faculty are always consulted concerning whether they wish their courses to be online or face-to-face, and changes of format are never made without consulting the instructor in question.

17.    Piety's seminar was the *only* upper-level philosophy seminar Drexel scheduled as "online-asynchronous" course -- a very un-seminar-like format. Indeed it was the only upper-level philosophy seminar Drexel was offering for the Spring that was completely online in an asynchronous format.

18.    Drexel made the switch without ever even informing Dr. Piety, against the Department of English and Philosophy's longstanding practice of consulting *all* faculty concerning whether they wish their classes to be online or face-to-face, as well as its explicit policy that tenured professors such as Piety are given priority in course assignments and scheduling. That priority is given because these faculty, unlike Teaching Professors and adjuncts, are the only faculty Drexel requires to research and publish; so it is important that they have the opportunity to teach courses that will support their research.

19.    Defendants' surreptitious altering of Dr. Piety's schedule meant Dr. Piety now would have to pre-record lectures for students to watch on their own or devise some other way to make up for the fact that she could not teach the course in the standard seminar format with live discussions.

20.    Dr. Piety realized that changing the course to a prepackaged remote course would consume an enormous amount of her time and resources and that this would mean she would be forced to put aside the scholarly work she needed to finish before the start of the Spring term. She was also faced with the prospect of lower student course evaluations than she ordinarily received for the course because the few times she has taught fully online asynchronous courses she has received lower student evaluations than she generally receives in face-to-face classes.

21.     Dr. Piety was looking forward to teaching the seminar. Philosophy of religion is one of her areas of specialization, and teaching the course fosters her research agenda – publishing her research is a job requirement. The Philosophy program is small, and there are few majors, so Drexel offers it just once per year.

22.     Dr. Piety knew this surprise switch was retaliation for her lawsuit. In academia, course scheduling is often used as a way of harassing professors, to surreptitiously increase their workload by forcing them to do an additional course preparation, after a first course is cancelled, as well as by assigning them courses with higher enrollments; as well as to disrupt their research plans and to make their day-to-day work more grueling. Dr. Piety knew the lack of notice was intentional, to catch her by surprise -- if she had not found out on her own and by accident that her course had been switched to remote, online-asynchronous, she would have shown up for the term wholly unprepared and suffered the consequences including poor student teaching evaluations, which would have translated into a poor annual performance review.

23.     That same day, February 11, Dr. Piety appealed by email to Philosophy Program Director Amato to change the course back to face-to-face.

24.     Dr. Amato was aware of the lawsuit. Dr. Piety through her counsel took his deposition in 2023 primarily regarding the Title VII hostile work environment claim, which was dismissed on summary judgment in July 2024. He was subpoenaed by Dr. Piety as a hostile witness for the January 2025 EPA trial but was not called to testify.

25.     In her appeal to Dr. Amato to change the course back to face-to-face, Dr. Piety wrote that he should have discussed this fundamental change of format for the seminar with her before making it. Even if he had made the change to "online-asynchronous" because he thought the course otherwise would not enroll enough students, she explained to him, she could have

reminded him that the course was cross-listed with Jewish Studies and thus would likely have enough students as indeed it had for many years. She pointed out that *PHIL 391: Philosophy of Religion* was not an online course and had been face-to-face.

26.    That evening, Dr. Amato replied that he was not sure if he could change the course back to face to face. He emailed: "So sorry about that! I didn't do it on purpose! I thought that's what you wanted. That was my mistake." He emailed a few minutes later and said "my apologies for the screw up. I might have been thinking of 291 online in the spring as we've usually been doing. My bad."

27.    Dr. Amato suggested a replacement instead: a different face-to-face course scheduled for Mondays and Wednesdays.

28.    Dr. Piety realized this would change her upcoming Tuesday and Thursday teaching schedule into a Monday through Thursday schedule, which meant she would be required to come to campus not twice but three times per week. Not only do tenure-line professors typically teach only twice a week in order to reduce their travel time and hence have more time for research, but an extra trip into the city also would mean an added expense for Dr. Piety since she takes the train.

29.    A few minutes later, Dr. Amato inflicted a new surprise on Dr. Piety: He wrote: "Another option – if you don't object to teaching 391 [*PHIL 391: Philosophy of Religion*] online but want at least one face-to-face class – could be to switch your 110 class (online) for a face-to-face section."

30.    This response shocked Dr. Piety: she was unaware until just then that her *other* class, the "110 class," *Introduction to Philosophy*, was now *also* remote online-asynchronous. She had assumed when she had agreed to teach it that it would be face-to-face and Dr. Amato

had not indicated anything to the contrary. Indeed, Dr. Piety had explained to Dr. Amato in the past that she did not like teaching online.

31.    She realized Drexel was trying to banish her from campus.

32.    The next morning, February 12, she wrote back to Dr. Amato: "I just saw this email after I responded to your other email. I never asked to teach an online section of any course. As you know from many earlier conversations we've had about scheduling, I don't like teaching online. I do not want to teach 110 online. As a tenured professor, I have priority in scheduling. You know I don't like teaching online and you didn't even consult me before assigning me an online class, so please switch the 110 you assigned me with a face-to-face section."

33.    About two hours later, Dr. Amato emailed Dr. Piety to offer her a schedule of two face-to-face courses, but both were introductory: *PHIL 105 Critical Thinking* and *PHIL 110 Introduction to Philosophy.*

34.    Dr. Piety responded about 45 minutes later: "I appreciate your efforts to correct my spring schedule. Unfortunately, your suggestion that I teach a section of 110 [*Introduction to Philosophy*] and 105 [*Critical Thinking,* an introductory course] not only deprives me of an upper-level seminar in my area of expertise, it relegates me, once again, to teaching only intro-level courses, a fate no tenure-line professor with research obligations should ever find themselves in." Dr. Piety has taught more introductory courses than any other tenure-line philosophy professor despite that she is the most senior member of the Philosophy faculty.

35.    Later that afternoon, Dr. Piety further emailed, "If I am forced to accept a schedule change at the last minute, then I want to teach two sections of the same course. I don't care if it is 110 [*Philosophy of Religion*] or 105 [*Critical Thinking*]."

36.    Dr. Amato responded two hours later that he could only provide two sections of the introductory *PHIL 105: Critical Thinking*.

37.    This option was unappealing to Dr. Piety, as it is to most professors, because this course is required by Drexel as part of fulfilling the requirements of several different majors and thus includes few Philosophy majors. As a result, the courses are large, the students often unenthusiastic and unprepared. Teaching one section is a great deal of work; two is oppressive for a faculty member tasked with research obligations. Nor would teaching this introductory course help Dr. Piety make progress on her required scholarly research and writing, which is more specialized. For these reasons, tenured faculty use their priority to avoid teaching any section of this course. No tenure-line professor was scheduled to teach *Critical Thinking* in the Spring, and no tenure-line professor is scheduled to teach it in the 2025-2026 academic year.

38.    That same day, February 12, Dr. Amato also emailed and offered Dr. Piety an upper-level seminar on Immanual Kant, scheduled for Friday afternoons (a time most students avoid scheduling classes and hence most professors avoid as well for fear their classes would be cancelled due to low enrollment).

39.    Dr. Piety immediately thanked Dr. Amato for the suggestion but had to turn it down. She wrote: "Sadly, I must decline the offer to teach Kant. I'd actually love to teach that course with sufficient advance warning. I can't teach it this spring, though, because I have too much other work to get done during my term off to take on the task of putting together an entirely new upper-level seminar.  I've got several research projects of my own to complete and I just agreed to review a book proposal for Baylor [University Press]."

40.    So, the next morning, February 13, Dr. Piety reluctantly agreed to teach the two sections of *PHIL 105: Critical Thinking*: "Yes, I will take two face-to-face sections of 105.

Since my schedule was changed at the last minute without my having been consulted, and since this puts me in a position where I am presented with only unattractive options and forced to choose between them, two face-to-face sections of 105, despite the fact that it relegates me to once again teaching only 100-level courses, seems the least unattractive of my options."

41.     On February 17, however, Philosophy Program Director Dr. Amato made Dr. Piety's schedule even worse, emailing: "Here are the sections to which you have been reassigned for the spring term."  Dr. Piety saw that he had scheduled the two sections of *Critical Thinking* back-to-back from 11:00-2:00, with just a 10-minute break between them.

42.     Dr. Piety responded to remind him that she had told him "repeatedly" that she did not like teaching courses back-to-back, and that this schedule would render her unable to eat lunch. She suffers from migraines, and missing lunch can trigger one.  She asked if he could move one of the sections so she could have a lunch break.

43.     Dr. Amato then offered her a section of *PHIL 110: Introduction to Philosophy* -- which brought Dr. Piety back again to teaching two separate introductory courses, which she had already explained she did not want to do because each, alone, would take an enormous amount of work, and there would be two separate preparations. So she asked again if there were not another section of *Critical Thinking* that he could give her that would not be back-to-back.

44.     Dr. Amato said No.

45.     That was not true, as Dr. Amato had *just created* an additional section of *Critical Thinking* (without consulting her per Department policy) to create the back-to-back schedule he assigned Dr. Piety.

46.     Dr. Piety wrote, "Thanks for responding so quickly. I'm confused, though. Usually we have quite a few sections of 105. Isn't there a section either earlier or later than the ones you've assigned me that could be substituted for one of the ones you assigned me?"

47.     Dr. Amato refused.

48.     Dr. Piety responded, "Faced with only unpleasant alternatives, I will keep the two back-to-back sections of 105 [*Critical Thinking*]."

49.     Dr. Amato also emailed Dr. Piety that same day, February 17, claiming that because of his efforts to accommodate her, he had to rearrange the schedule of other professors and take a section away from an adjunct professor. A few minutes later, Dr. Piety wrote back, acknowledging that *Dr. Amato's failure to consult with her initially (per the Department policy)* is what led to his purportedly having to change the schedules of other professors, especially those who are not tenure-line and who do not have priority in scheduling -- but that now *she* would end up getting blamed for those disruptions when they were not her fault but *his*: "Not only do I care very much about the situation of other faculty, I am concerned that because of your failure to alert me to changes to my schedule that you made without consulting me, faculty who will be forced to change their own schedules because of this failure, will blame me for the inconvenience when it is not my fault." That blame would negatively affect her standing among other faculty. In another email that same day, Dr. Piety told Amato: "I realize that scheduling is very challenging and I have tried hard to work with you (witness all the 100-level classes I have taught, despite being a tenured full professor and the most senior member of the philosophy faculty)."

50.    On March 6, Dr. Amato harassed Dr. Piety again: He emailed to say that the section of *Critical Reasoning* (the one he had added to make the back-to-back schedule) lacked sufficient enrollment, so he was canceling it.

51.    The retaliation was a further disruption of Dr. Piety's plans: this coming Fall term, Dr. Piety now must teach two courses that term rather than one (as she must teach five courses over three terms, usually 2-2-1). Her longstanding plan for the Fall was that it would be her term to teach one course, as it would be her third term in a row teaching, and because she planned to attend the week-long annual meeting of the American Academy of Religion that term where she was scheduled to present a paper and attend a meeting of the Kierkegaard and Culture Unit Steering Committee.

### Piety Appeals to Department Head Roger Kurtz

52.    On February 12, Dr. Piety appealed to the Department Head, Dr. Kurtz, to correct Dr. Amato's moving *PHIL 391: Philosophy of Religion* and *PHIL 110: Introduction to Philosophy* online and restore the courses to face-to-face on campus. She explained how she had learned only the day before, by accident, that both of her courses had been turned into remote online-asynchronous courses. Piety wrote, "I know, from experience, that schedule changes can be made any time and that it is thus not too late to make them now."

53.    Less than two weeks earlier, Defendant Dr. Kurtz had been Drexel's corporate representative in the Equal Pay Act trial and was cross-examined extensively by Dr. Piety's counsel.  Kurtz was evasive, and Piety's counsel ultimately forced him to make admissions that helped Piety win the case. His testimony regarding how he failed to remedy the massive pay disparities between male and female faculty, which he had known about since coming to Drexel

to head the Department in 2017, and Defendants' cover-up of the discrepancies, was highlighted in closing argument to the jury to prove Drexel had willfully violated the Equal Pay Act.

54.     Dr. Kurtz responded to Dr. Piety's email five hours later, stating: "Regarding PHIL 391 [*Philosophy of Religion*], this needs to be taught in an online format for the spring. **I double checked this issue with the dean's office, who are the ones wanting it to be online in the first place**" (emphasis added). Dr. Kurtz added, "I'm copying Pete [Amato] here, so that he is also in the loop."

55.     Dr. Kurtz's explanation contrasted with Dr. Amato's earlier claims that changing Dr. Piety's class from face-to-face to online-asynchronous was his own "mistake."

56.     Dr. Piety was shocked to learn that the change had come from the Dean's Office, which was unusual and which she understood could only be retaliation by Defendant Dean Brown for her lawsuit. Dean Brown was aware of both the lawsuit and the judgment, because Dr. Piety had communicated with him about the lawsuit at least as far back as 2024 and about the judgment shortly after the trial.

57.     Upon information and belief, Defendant JuHwon Lee, who as Associate General Counsel and Chief, Litigation Service for Drexel, has overseen the Equal Pay Act litigation and attended the January 2025 trial, was also involved in this decision to keep Dr. Piety away from campus in retaliation for her lawsuit.

58.     Dr. Piety responded: "I remain shocked by this sudden and unexpected change," and explained that Dr. Amato "typically asks *all* faculty what courses they would like to teach and in what mode," that she was looking forward to teaching *Philosophy of Religion* face-to-face, that it is one of her favorite courses to teach, and that "I have been looking forward to returning to campus" after her off-term. She added: "the offered alternatives to my teaching

PHIL 391 [Philosophy of Religion] online relegate me once again to teaching only intro-level courses, courses that are harder to teach because the class sizes are larger, the students are less motivated to take them, and they need much more help with both reasoning and communication skills. Those courses also don't feed into my research agenda the way PHIL 391 does." Dr. Piety ended her email saying, "I understand that the dean's office and you give me no option but to work with Pete [Dr. Amato] regarding alternatives."

59.    Dr. Kurtz also, in his February 12 response, claimed that he had had to seek special permission from the Registrar to run the *PHIL 391: Philosophy of Religion* seminar in prior years; Dr. Piety responded on March 4 with actual enrollment numbers from prior years to show that such permission should not have been necessary. Dr. Kurtz never responded.

60.    Dr. Piety discovered further evidence that her seminar scheduled for this Spring had been intentionally sabotaged by Drexel to retaliate for her lawsuit. Dr. Piety's *PHIL 391: Philosophy of Religion* seminar had been capped at 25 students, the standard cap for 100- and 200-level introductory courses, despite that upper-level seminars (*i.e.,* 300-400 level courses) are generally capped at a lower number than introductory courses because upper-level seminars typically have lower enrollments and hence need lower caps to avoid being cancelled. (That is, the lower the capped/ceiling enrollment, the lower the number of students required in order for the course to run.) Yet even *PHIL 255: Philosophy of Sex and Love*, which was also scheduled for this Spring term, was capped at 23, which was lower than the cap on Dr. Piety's *300*-level course, despite that PHIL 255 is an inherently more attractive course, both because it is only a 200-level rather than a 300-level course and also because "sex and love." And *PHIL 485: Kant* had been capped at only 16.

61.    Moreover, after Dr. Amato took over *PHIL 391: Philosophy of Religion* from Dr. Piety to teach it as remote online-asynchronous, *he* then used his scheduling authority to lower the cap/ceiling to 17 students.

62.    The 25-student cap on her *PHIL 391: Philosophy of Religion* seminar was artificially high and therefore was intentionally set by Defendants *to increase the probability that the course would be canceled at the last minute.* Last-minute cancelations are a major inconvenience, because they force faculty to have to scramble to find a different course to teach, necessitating new, last-minute preparations – and rendering the work preparing for the canceled course wasted time and effort that also disrupts and prevents required scholarly work. In addition, courses substituted for cancelled courses are nearly always introductory-level because those are the only courses for which there are multiple sections scheduled in a single term, meaning that, very often, a professor who had been planning to teach an upper-level seminar that fosters her required research is relegated to teaching an introductory course.

63.    Dr. Piety is still reeling from Drexel's manipulating her schedule and gaslighting her. This obvious retaliation – *ordered by Defendant Dean Brown* – distresses her because it makes her feel that she will never be able to stop Drexel from harassing her, and that even defeating Drexel in court and proving to a jury that Drexel had discriminated against her *willfully,* which resulted in an additional penalty for Drexel in the Equal Pay Act judgment, cannot deter Drexel from continuing to harm and harass her. The retaliation goes all the way up the hierarchy to at least the Dean of the College of Arts and Sciences, Defendant Dr. David Brown. There is thus nowhere other than this Court to whom Dr. Piety can appeal to make the retaliation stop.

64.     Dr. Piety is further distressed because, as a result of Drexel's unilateral and retaliatory actions, Dr. Piety, a world-renowned scholar, is the only tenure-line professor in the Department who is assigned a teaching load this academic year that is 75% introductory courses, *i.e.*, two 100-level courses and one 200-level course, courses that are usually taught by non-tenure line faculty who are not required to research and publish and who thus do not need to teach courses that support their required research. These course assignments deprive Dr. Piety of the opportunity to teach courses that feed her research agenda rather than distract from it, and each represents a lost opportunity that cannot be regained. These teaching assignments also make it appear, falsely, to colleagues and students that she is unqualified to teach higher-level courses.  The high enrollment caps that are put on the few upper-level seminars she is allowed to teach make it more likely that her courses will be canceled, encouraging the false impression on the part of colleagues, administrators, and students, that she is an unpopular teacher.

65.     Drexel's last-minute, surprise changes of Dr. Piety's courses send Dr. Piety the message that Drexel is working to cause her to have lower status and standing than she deserves; to impede her research; to stall her academic trajectory; and diminish her voice on campus and indeed keep her away from campus.

66.     Defendants' retaliatory course scheduling was intended to, and does, send a message to Dr. Piety and other employees that any effort to remedy discrimination by Drexel will be futile and met with repercussions calculated to make their work environment miserable, diminish the terms and conditions and privileges of their employment, and harm their academic careers.

**Retaliation Can't Wait: Drexel Refuses, Despite the January 31 Judgment, to Raise Piety's Salary**

67.     On February 4, 2025, before she learned of the retaliatory course changes, Dr. Piety emailed the Dean of the College of Arts and Sciences, Defendant Dr. David S. Brown, to request a meeting to discuss raising her salary in accordance with the January 31 Equal Pay Act judgment.

68.     Dean Brown said he would get back to her after he took up the matter with the head of HR and university counsel. He has not further communicated with Dr. Piety about his issue and has not raised her salary.

69.     Defendant Dean Brown's actions are intended to and do send Dr. Piety the message that even a jury verdict and a finding of willful discrimination that further penalized Drexel cannot deter Drexel from discriminating against her and other women and cannot force Drexel to follow the law and raise her salary to make up for the underpayment that has robbed her of earned pay for several years.

**Experience What Retaliation Can Be: Drexel Officials, After Learning of the Lawsuit, Renege on Promises to Help Fund a Conference That Piety Created at Yale**

70.     During the 2023-24 school year, Dr. Piety created a joint Drexel-Yale conference to be held at Yale University in December, 2024 highlighting the work of George MacDonald, a 19th Century Scottish theologian and author.

71.     On or about March 26, 2024, Dr. Piety requested funding from Defendant Dean Brown and Drexel's then-President, John Fry, to support and promote the conference and cover some of the corresponding expenses, such as expenses for scholars whose home institutions would not cover them, refreshments and promotional items for conference participants, such as

customized tote bags that included a conference logo that included the names of both Drexel and Yale University.

72.     In an email on April 2, 2024, Dean Brown and President Fry agreed to provide $5,750.00 each to help with the conference, for a total of $11,500.00.

73.     Dr. Piety, after learning that such funding had been approved, wrote to President Fry and Dean Brown and thanked them. In an email response on April 7, 2024, President Fry wrote to Dr. Piety: "Thank you for your kind note. It is an honor to provide support for one of our truly distinguished faculty, and I am grateful for your leadership in organizing the MacDonald conference."

74.     The correspondence from President Fry made Dr. Piety realize that the President and Dean Brown must not know about her discrimination lawsuit, which by this time had been pending for almost two years.

75.     Afraid that Dean Brown and President Fry might accuse her of trying to conceal the lawsuit from them, Dr. Piety dutifully informed Dean Brown about the lawsuit in an email dated April 24, 2024. She explained how the lawsuit had come about and how Drexel had refused to discuss the "very modest settlement proposal" she had made before filing suit and how "Drexel's outside lawyers have dragged the case out and refused to consider any settlement offer where I would remain at Drexel. I want you and President Fry to know that I want to stay."

76.     She added that she was not writing to President Fry but that Dean Brown could tell him about the lawsuit: "I have no objection, whatever, though, if you would like to share this information about my situation with President Fry. I feel that it is important that you and

President Fry know about it, and that if you do not already know about it, you hear about it first from me, rather than from someone else."

77.     Dean Brown wrote back about two hours later: "Hi Marilyn. I appreciate the time you took for putting this together and for letting me hear it from your voice. Hope all is well-"

78.     After that, however, Dr. Piety had trouble obtaining the conference funding. She heard nothing further from Dean Brown regarding her request for funds until June 6, 2024, when he refused to provide any promotional or tech support for the upcoming conference at Yale. He claimed that he was refusing because, when she requested the money, Dr. Piety had not specifically budgeted for these things.

79.     Dr. Piety emailed President Fry the next day to ask that Drexel at least set up the conference website. She wrote: "If Yale hosts the conference website, though, Yale, rather than Drexel, will get all the web traffic, which would mean that Drexel wouldn't get nearly the PR we would get if we hosted the website."  Dr. Piety added: "I'm writing to you in one last ditch effort to solve this problem of setting up the conference website on Drexel's website rather than Yale's. It was so kind of you and Dean Brown to support the conference to the extent that you have. I assume that you also want to make sure that Drexel gets the maximal benefits from the event."

80.     About two hours later, President Fry emailed Dr. Piety to say he would stand by Dean Brown's decision.

81.     The joint conference with Yale offered an unprecedented opportunity for Drexel to promote itself, and that had been the primary basis for Dr. Piety's appeal to the Dean and the University President for financial support. She had assumed that they knew about the lawsuit

but that they would want, despite it, to take advantage of the unprecedented opportunity to reap the positive promotional benefits of co-sponsoring an event with an Ivy League university.

82.    The Dean's Office in Drexel's College of Arts and Sciences has its own promotional staff precisely to promote such events.

83.    After Dean Brown refused to use the College's promotional staff to publicize the conference with Yale and technical staff to create a webpage for it, Piety was unable to get any response from him, his office, or from Darius Graziani, his Executive Director of Finance and Administration, regarding accessing the already-promised funding for other aspects of the conference.

84.    During the summer of 2024, with the December Drexel-Yale conference fast approaching, and many tasks left to be done for which Drexel had already promised funding, Dr. Piety was left without even the ability to set up an account into which conference attendees could deposit registration fees. Likewise, she could not order the necessary catering or purchase customized tote bags or other promotional items.

85.    President Fry left Drexel on or about September 30, 2024.  Denis O'Brien stepped in, however, as "Interim President" even before Fry officially left. On August 6, 2024, Dr. Piety appealed to him, asking him to intercede on her behalf to get Mr. Graziani to respond to her emails. One of President O'Brien's assistants, Melissa Richman, said that she would contact Mr. Grazianni.

86.    However, even after the intervention of President O'Brien's office, Mr. Graziani continued to obstruct the planning of the conference, by, for example, *misdirecting* Piety concerning what institutional credit card to use and then continuing to either fail to respond to

her emails or to delay his responses, forcing Dr. Piety to appeal again to President O'Brien's office.

87.     By the time Dr. Piety was finally able to sort out the funding issues, the ordering of the customized conference tote bags had been so delayed that the vendor was unable to deliver the bags that had been promised to conference participants by the date of the conference.

88.     Instead, the customized tote bags had to be mailed, individually, to each participant, *after* the conference was over and the attendees had already left the Yale conference site.

89.     Because of Defendant Dean Brown's retaliatory actions, Dr. Piety was left feeling embarrassed and humiliated, fearing she may be perceived as ineffectual and disorganized by the many scholars who attended the conference that she created.

90.     Dean Brown's refusal to promote the conference or respond to Piety's emails concerning the delivery of the funds Drexel had promised was retaliation for her lawsuit. Drexel's desire to retaliate against Dr. Piety for her complaint of discrimination was obviously even greater than its desire to promote the institution through an unprecedented joint conference with a prestigious Ivy League school.


**Experience What Retaliation Can Be: Department Head Kurtz Gives Lower-than-Merited Faculty Annual Review (FAR) Scores to Dr. Piety**

91.     Defendant Dr. Kurtz, who as Department Head is Dr. Piety's supervisor, and who served as Drexel's "corporate representative" at the January 2025 trial and whose deposition was taken three times during this litigation (twice as Drexel's 30(b)(6) deposition corporate representative, once in his personal capacity), retaliated against Dr. Piety for her Equal Pay Act claim.

92.     On or about November 13, 2024, while the litigation was still ongoing, and less than two months after the Court entered a liability judgment against Drexel on the Equal Pay Claim as a sanction for Drexel's violation of Court orders (and scheduled the trial on damages and willfulness for January 2025), a sanction imposed when Dr. Kurtz was present in the court room, Department Head Kurtz manipulated his 2023-2024 Faculty Annual Review (FAR) of Dr. Piety to artificially and falsely deflate her scores for both teaching and scholarship.

93.     Department Head Kurtz gave Dr. Piety a teaching score of 3 when the aggregate scores on her student course evaluations were slightly over 4 on a scale of 1 to 5, 5 being the top score.

94.     The point scale for each category on the FAR form is the same as that for the student course evaluations, i.e., 1-5, yet Kurtz gave no explanation for giving Piety a 3 rather than the 4 she had earned on the student evaluations other than his claim that the student evaluation scores do not translate directly to FAR scores. This claim contrasted with his usual practice of using the student evaluation scores *as the basis* for FAR teaching score. The faculty in the department have, in fact, developed additional criteria for evaluating teaching because of complaints that Kurtz would not award scores higher than the student evaluation scores and that faculty should be given credit for things such as innovation in teaching methods, etc.

95.     Defendant Kurtz awarded Dr. Piety a "4" for her scholarship. Although this is a good score, it is below what Piety should have received based on her accomplishments, which exceeded not only those of all faculty in her Department but also those of all the faculty in Drexel's College of Arts and Sciences.

96.     During the 2023-24 academic year, according to a document compiled by Defendant Dean Brown, Dr. Piety published and presented twice as many scholarly articles as the next most productive professor in Drexel's College of Arts and Sciences.

97.     In addition to creating and organizing the conference at Yale, Dr. Piety presented four (4) separate papers at academic conferences and published two (2) scholarly articles. That is, Dr. Piety exceeded, *in a single year,* Drexel's requirement that tenure-line faculty ("research faculty") publish two (2) scholarly articles over a period of *three* (3) years.

98.     Dr. Kurtz claimed that he could not give a score higher than 4 but less than 5 because he was not allowed to award anything other than "whole number" FAR scores. This claim directly contradicts the specific instructions on the FAR materials, which clearly state that department heads can award FAR scores in between the whole numbers.

99.     Kurtz's assigning Dr. Piety lower FAR scores than she had earned causes Dr. Piety humiliation and frustration. It also endangers Dr. Piety's standing at Drexel, because Kurtz's annual reviews of Piety are the only impression Dean Brown or any upper-level administrators have of Dr. Piety's performance. This retaliation causes her additional stress and anxiety, because Drexel is suffering from financial problems, and any merit raises are likely to be awarded to only a few faculty members – those with the highest scores.

100.    Department Head Kurtz's retaliation against Dr. Piety in her FAR was calculated by Kurtz to send Dr. Piety and other Drexel employees the message that even defeating Drexel in court cannot stop Drexel from falsely evaluating their work and harming them with punitively low FAR scores and that, in fact, they will receive lower FAR scores if they report or try to remedy Drexel's illegal discrimination.

**Retaliation Can't Wait: Department Head Kurtz and Dean Brown Refuse to Publicize Dr. Piety's Professional Accomplishments**

101.    As Department Head, Defendant Dr. Kurtz has a practice of distributing "kudos" emails announcing faculty accomplishments, such as their presentations at conferences, publications, publishing contracts, awards, and nominations for awards

102.    Kurtz's policy is, as he has stated in email, "to share faculty and student accomplishments as and when faculty let me know about them."

103.    Kurtz even sends out "kudos" about students.  For example, on April 14, 2025, Dr. Kurtz sent out an email congratulating an English major for being accepted to law school.

104.    However, since the liability judgment that the Court entered against Drexel as a sanction in September, 2024, Dr. Kurtz has retaliated against Dr. Piety by *refusing* to publicize any of her accomplishments.

105.    For example, on October 30, 2024, Dr. Piety was invited to be the keynote speaker at the upcoming 10th International Kierkegaard Conference at St. Olaf College, Minnesota in the summer of 2026. The invitation states that the honor is to "highlight [her] body of work and continued influence on Kierkegaard studies."

106.    Dr. Piety forwarded this career milestone invitation to Dr. Kurtz, to send out in a kudos email.

107.    However, Kurtz refused, claiming that any announcement would be too far in advance of the event.

108.    Of course, the invitation for Dr. Piety to be the keynote speaker is a rare honor, akin to a lifetime achievement award, and Drexel's sharing and publicizing such news would reflect well on the Department and on Drexel. Upon information and belief, no other

Department faculty member ever has been invited to be the keynote speaker at an academic conference.

109.    On January 24, 2025, three days before the Equal Pay Act trial, Dr. Piety was invited to present a paper at an upcoming workshop on Kierkegaard at Princeton University during the summer of 2025.

110.    Dr. Piety reported this news to Dr. Kurtz to send out in a kudos email. Once again, Dr. Kurtz refused to share it, claiming, again, that the invitation was too far in advance of the event.

111.    In addition, on or about December 16, 2024, Piety learned that Dr. Kurtz had *not* sent all her recent accomplishments for inclusion in a document the Dean's office had distributed to all faculty in the College of Arts and Sciences.

112.    Upon discovery of the omissions, Dr. Piety sent the missing accomplishments directly to Dean Brown.

113.    Dean Brown corrected the document for the record and sent it to Dr. Piety, but he refused to send the corrected document out to the community.  The corrected version shows that Dr. Piety presented and published more papers and articles, not merely than any other faculty in the Department of English and Philosophy, but more than any other faculty in Drexel's entire College of Arts and Sciences in the time period covered by this Dean's Office publication.

114.    On or about February 3, 2025, a few days after the Equal Pay Act judgment against Drexel, Dr. Piety asked Dean Brown to send out the information regarding the invitation for her to be the keynote speaker at the 2026 Kierkegaard conference.

115.    Dean Brown agreed to do so and said he would. However, more than two months later, he still has not.

116.    The refusal of Defendants Kurtz and Brown to publicize Dr. Piety's accomplishments in accordance with the customary policies and practices they follow for other faculty is obviously retaliation for her lawsuit and is part of Defendants' ongoing retaliatory effort to diminish her status and standing at Drexel, marginalize and isolate her from the community, and send her and other employees the message that it will defy any federal court judgment against it.

117.    Defendants are more motivated to retaliate against Dr. Piety than it cares about bringing positive attention to the Department, the College of Arts and Sciences, and the University itself.

**Experience What Retaliation Can Be: Dean Brown Refuses to Appoint Piety as Director of the Religious Studies Program**

118.    The Religious Studies program has been without a director for several years, and no faculty other than Dr. Piety has expressed a wish to fill that position.

119.    In retaliation for her lawsuit, and in spite of her overwhelming qualifications for the position as well as the support she has received from the other Religious Studies Faculty, Dean Brown continues to refuse to appoint Dr. Piety to be the director.

120.    Dean Brown also continues to refuse to support Dr. Piety's proposal to rename the program "Spirituality Studies," notwithstanding the support from both faculty and students.

121.    Pursuant to official College policy, the name of the program cannot be changed until a director is appointed.

122.    On or about January 14, 2025, about two weeks before the Equal Pay Act trial, Dean Brown told Dr. Piety that he would get back to her on both of these issues, but now, more than three months later, he has not.

123.    Defendants are more motivated to retaliate against Dr. Piety by refusing to name her as director for its Religious Studies Program than to launch a program that research suggests would be the first of its kind in the country, and which would be popular with students and serve the interests of the institution.

**Experience What Retaliation Can Be: Throughout the Lawsuit, Drexel Has Refused to Settle Unless Piety Gives Up Her Tenured Position and Leaves Drexel**

124.    Before filing her lawsuit, Piety reached out to Drexel with a modest pre-lawsuit demand on April 5, 2022, asking, *inter alia,* that Drexel provide anti-bullying training in the Department of English & Philosophy, provide her with sabbatical time to make up for time lost to the discriminatory harassment and bullying, adjust her salary after an audit to account for the effects of sex discrimination in pay, and pay her $50,000 for emotional distress, pain, and suffering -- and she said she was open to discussion.

125.    The demand was geared toward improving the Department by equalizing pay and ending its persistent and pervasive culture of sex-based bullying and discrimination. Indeed, Drexel itself concluded in early 2016, after a complaint by one of Dr. Piety's female colleagues, that the Department was a hostile workplace for female faculty and employees.  (Despite that conclusion, Drexel never provided the remedial workshops HR had promised.)

126.    Drexel, however, *refused even to discuss Dr. Piety's modest demand with her,* thereby forcing her to file suit on May 9, 2022 to meet the statute of limitations, *Marilyn Gaye*

*Piety Foley v. Drexel University*, 22-cv-2022, the lawsuit for which Drexel has been retaliating against her.

127.    Throughout the litigation, including as the Equal Pay Act claim was headed to trial, Drexel *expressly refused* to discuss any resolution that would not require, as an essential term, Dr. Piety to resign from her hard-earned position as a tenured full professor of Philosophy and give up her employment at Drexel. However, despite such a punitive condition, Drexel made no offer even approaching the pay that Dr. Piety would be forced to give up in the coming years, as she is tenured and plans to teach at Drexel for at least 10 more years. Defendants know that no reasonable tenured professor would accept such an offer.

128.    Defendants' demand is punitive and retaliatory, because it essentially requires Dr. Piety to give up her entire career. That is because tenured and even tenure-track faculty jobs are rare, and the number of them nationwide is dwindling as schools cut costs, eliminate philosophy majors and even entire programs, and seek to replace tenured faculty with contingent faculty; it is extremely unlikely that Dr. Piety, despite her excellent credentials and many achievements, would find another such position. As Dr. Piety has explained to Drexel, including to Defendant Dean Brown and former President Fry via email on April 24, 2024 ("Drexel's outside lawyers have dragged the case out and refused to consider any settlement offer where I would remain at Drexel. I want you and President Fry to know that I want to stay."), she does not want to leave, as leaving Drexel means giving up her hard-earned career, a career she enjoys and finds fulfilling and in which she has achieved great success.

129.    Defendants have used the settlement process to try to force Dr. Piety, one of Drexel's most popular and productive professors, to retaliate against Dr. Piety by trying to force her to resign from Drexel for suing to remedy sex discrimination.

130.    Defendants never tried to force Dr. Piety to leave Drexel until only after she sued Drexel for discrimination and equal pay under federal law. Instead, Drexel promoted her through the years, gave her strongly positive annual reviews and regular merit raises. Dr. Piety consistently receives excellent teaching evaluations, consistently exceeds the publication requirements for tenure-line faculty, and has an outstanding record of service both to the university and to the profession of philosophy.

131.    Defendants' refusal to settle the lawsuit unless Dr. Piety leaves Drexel was an obvious retaliation against Dr. Piety for complaining of discrimination. Defendant JuHwon Lee, Esquire has overseen and controlled all aspects of this litigation and has acted in concert with all other Defendants to insist on the no-settlement-unless-Dr. Piety-leaves-Drexel condition of any settlement.

132.    Defendant Lee and Drexel retained an outside law firm, Tucker Law Group, which is known for its bullying and abusive and costly litigation tactics. Indeed, before Piety ever filed suit, the firm was called out by at least one local federal judge for its "scorched earth tactics" that had unnecessarily driven up the costs for all parties.

133.    Defendants, through Defendant Lee and the firm he retained, engaged in such scorched earth tactics throughout Dr. Piety's lawsuit as a way of wearing down Dr. Piety by forcing her to spend time and money on the lawsuit and by forcing her attorney, who is her husband, to spend inordinate amounts of time on her case, and to discourage other attorneys from signing on to help lest they become mired in the time-consuming tactics and motion practice that Drexel was funding – even during a time when Drexel suffers from financial woes that have been aired publicly in the news media.

134.    One such scorched earth tactic Drexel deployed was to file a baseless motion to disqualify Piety's husband from serving as her attorney, a bad faith, strategic move to try to cause Piety to be left without her chosen lawyer and unable to find another attorney to help her. After significant, time-consuming litigation, the Court denied Drexel's motion.

135.    Drexel's refusal, before Dr. Piety defeated Drexel at a jury trial, to settle the lawsuit with Dr. Piety unless she left Drexel has harmed Dr. Piety and has been motivated by Drexel's desire to retaliate against Dr. Piety for her lawsuit and is intended to, and has, caused Dr. Piety to suffer frustration and humiliation and emotional distress and is intended to send a message to other employees that they should never report or try to remedy discrimination, because, if they do, Drexel will use scorched earth tactics to wear them down, distract them from their teaching and research, deplete their finances, and deter attorneys from representing them or from continuing to represent them after the employee is drained of resources and left unable to pay.

136.    Dr. Piety is hampered in trying to pursue her required research, and she will continue to suffer frustration and humiliation and emotional distress.

**Retaliation Can't Wait: Dr. Kurtz Denies Dr. Piety's Request to Serve on the Department Ad Hoc Bylaws Review Committee**

137.    On March 20, 2025 Dr. Kurtz sent an email to all full-time faculty in the Department of English and Philosophy that he was seeking professors to volunteer to serve on an ad hoc committee to review the Department's bylaws.

138.    Dr. Piety immediately volunteered that same day.

139.    Kurtz did not appoint her.

140.    He sent out another email on April 1, 2025 to solicit more volunteers for the committee.

141.    On April 10, 2025, Dr. Kurtz emailed Dr. Piety:

*Dear Colleague,*

*I'm writing to thank you for being willing to serve on the ad hoc Bylaws Review Committee, but to let you know that I am not naming you to this serve with this group. We had a good number of people express their willingness to serve; I'll be announcing the committee to the whole department soon. Thank you again for your willingness, and I apologize for the form-letter nature of this note.*

*Regards,*

*Roger*

142.    Upon information and belief, Dr. Kurtz did not reject any other faculty member who asked to serve on this committee. He wrote the email to Dr. Piety in "form-letter" nature to create the false impression that she was not the only person her rejected to try to hide his retaliatory conduct.  This rejection was the second time since Dr. Piety first filed a complaint of sex discrimination against Drexel in 2020 that Dr. Kurtz has rejected her request to serve on a Department ad hoc bylaws committee.

143.    The idea that so many professors applied to be on this committee such that Dr. Kurtz could not personally email the ones he was rejecting and instead had to write a "form-letter" rejection email is not credible. Committee work is unpopular in the Department. It has occasionally even been necessary for the Department Head to use his authority to appoint

people to committees that normally are constituted by holding Department elections, because too few people were willing to stand for election. Indeed Dr. Kurtz was forced to solicit volunteers not once but twice for this ad hoc ByLaws Review Committee -- first in his March 20 email, and then again in his April 1 email.

144.    On April 10, about three hours after emailing Dr. Piety the "form-letter" rejection, Dr. Kurtz emailed the Department announcing the names of the eight (8) faculty members he chose to serve on the committee. There was just one full Professor, a male professor of English.

### Experience What Retaliation Can Be: Defendants' Conduct is Retaliation Against Dr. Piety for Reporting and Seeking to Address Sex Discrimination

145.    In sum, Defendants' retaliatory actions against Dr. Piety as described herein, all of which occurred during the pendency of her lawsuit and post-trial proceedings, are intentional and designed to:

- Drive her off campus.

- Prevent her colleagues from hearing through the usual official channels anything positive about her, including her many accomplishments, honors, and accolades.

- Sabotage her teaching schedule and disrupt and impede her research.

- Cause her to do more teaching-related work than her tenure-line colleagues are required to do by teaching mostly introductory courses and canceling classes on her at the last minute so that she must do extra, new course preparations and in this way sabotage her research plans and hence negatively impact her scholarly productivity.

- Cause her to receive lower faculty annual review scores than usual as a way of diminishing her pay and progress.

- Present a false picture of Dr. Piety to her students and colleagues (all of whom Drexel is keeping unaware of Piety's recent accomplishments) as unqualified to teach most upper-level courses and as qualified only to teach introductory courses.

- Deprive her of opportunities to take on administrative work and hence advance within the institution.

- Drive Piety out of Drexel entirely and end her academic career.

- Cause Dr. Piety to suffer emotional distress and financial hardship.

- Deprive Dr. Piety of and diminish the compensation, terms and conditions, and privileges of employment.

- Send a message to all Drexel employees that suing Drexel will cost them dearly and will result in their being forced to resign as part of any settlement, and/or that the employee will be marginalized - and driven out of the community.


## COUNT I

## EQUAL PAY ACT – RETALIATION

146.    Plaintiff repeats and incorporates by reference herein the preceding paragraphs of this complaint.

147.    The above-described conduct by Defendants – each act – was perpetrated by Defendants intentionally, deliberately, and willfully to retaliate against Dr. Piety for engaging in

protected activity to seek redress for pay discrimination; has been materially adverse to Dr.

Piety: each act would deter and was intended to deter Dr. Piety and other reasonable faculty

from making complaints of discrimination against Drexel. The conduct constitutes retaliation

against Piety in violation of the Equal Pay Act's anti-retaliation provision.

148.    Defendants have acted in the absence of good faith and reasonable grounds.

Their actions were and are outrageous, egregious, malicious, intentional, willful, wanton, and

done with malice or reckless indifference to Piety's federally-protected rights, and with

knowledge or reckless disregard for whether their retaliatory conduct was a violation of the

Equal Pay Act and warrant the imposition of all available damages including compensatory and

punitive damages.

## COUNT II:

## EQUAL PAY ACT – RETALIATORY HARASSMENT / HOSTILE WORK ENVIRONMENT

149.    Plaintiff repeats and incorporates by reference herein the preceding paragraphs of

this complaint.

150.    The above-described conduct by Defendants was perpetrated by Defendants in

bad faith, intentionally, deliberately, and willfully to retaliate against Dr. Piety for engaging in

protected activity to seek redress for pay discrimination, and has been materially adverse to Dr.

Piety: these acts are severe and/or pervasive and have created a hostile working environment for

Dr. Piety and would deter and were intended by Defendants to deter her and other reasonable

faculty from making complaints of discrimination against Drexel. The conduct constitutes

retaliatory harassment against Piety in violation of the Equal Pay Act's anti-retaliation

provision.

151.    Defendants have acted in the absence of good faith and reasonable grounds. There actions were and are outrageous, egregious, malicious, intentional, willful, wanton, and done with malice or reckless indifference to Piety's federally protected rights, and with knowledge or reckless disregard for whether their retaliatory conduct was a violation of the Equal Pay Act and warrant the imposition of all available damages including punitive damages.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment in her favor and against the Defendants:

1.   A declaratory judgment that the acts and practices of Defendants complained of herein are retaliation for Plaintiff's protected activity in violation of the Equal Pay Act;

2.   An injunction permanently enjoining and restraining Defendant Drexel and its employees and agents from retaliating against Dr. Piety and/or continuing any of the acts and practices complained of herein or any other acts in retaliation for her protected activity;

3.    An injunction requiring Drexel to provide anti-bullying training to its employees;

4.    Award compensatory damages on all claims to Plaintiff to make Plaintiff whole for all past and future lost earnings, benefits, earnings capacity, interest, and other financial losses which Plaintiff has suffered and will continue to suffer as a result of Defendants' retaliatory conduct;

5.    Award damages for emotional distress Plaintiff has incurred as a result of Defendants' illegal retaliation;

6.     Award punitive damages to Plaintiff pursuant to her claims for retaliation;

7.     Award liquidated damages to Plaintiff pursuant to her claims for retaliation;

8.     Award reasonable attorneys' fees and costs Plaintiff and her attorneys have incurred or will incur in pursuit of her claims in this lawsuit;

9.     Award pre- and post-judgment interest;

10.    Mold any verdict/award in Plaintiff's favor to provide her the maximum financial recovery allowed by applicable damage caps; and

11.    Any and all other relief the Court may deem to be just and proper.

## JURY DEMAND

Plaintiff hereby demands trial by jury as to all issues so triable.

**BRIAN J. FOLEY, ATTORNEY AT LAW**

BY: */s/ Brian J. Foley*
     **BRIAN J. FOLEY, ESQUIRE**
     Attorney for Plaintiff

Date:  April 25, 2025