## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MARILYN GAYE PIETY FOLEY,**<br>**Plaintiff,**<br><br>v.<br><br>**DREXEL UNIVERSITY, DAVID S.**<br>**BROWN, ROGER KURTZ, and JUHWON**<br>**LEE,**<br>**Defendants.** | **CIVIL ACTION**<br><br><br><br>**NO.  25CV2103** |

## MEMORANDUM OPINION

Plaintiff Marilyn Gaye Piety Foley, an academic philosopher, has sued her employer, Defendant Drexel University, and three Drexel employees, Defendants David S. Brown, Roger Kurtz, and Juhwon Lee (the "Individual Defendants"), alleging that they retaliated against her in violation of the Equal Pay Act of 1963, 29 U.S.C. § 215(a)(3), and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681.  Defendants have moved to dismiss Piety Foley's First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), and to strike certain portions of that pleading pursuant to Federal Rule of Civil Procedure 12(f).  For the reasons set forth below, the Motion to Dismiss will be granted in part and denied in part, and the Motion to Strike will be denied as moot.

### I.    FACTUAL BACKGROUND

Except where otherwise noted, the following facts are taken from Piety Foley's First Amended Complaint, well-pleaded allegations from which are taken as true at this stage.  *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).

#### A.  Piety Foley's First Lawsuit

Plaintiff Marilyn Gaye Piety Foley is employed as a tenured Professor of Philosophy by

1

Defendant Drexel University.  The case at bar is the second discrimination lawsuit Piety Foley

has filed against Drexel.  In 2022, Piety Foley sued Drexel and Roger Kurtz, the head of her

academic department, alleging hostile work environment and retaliation under a slate of state and

federal antidiscrimination laws, breach of contract, and violations of the federal Equal Pay Act.

She later dropped her breach of contract claim, and the Court granted summary judgment for the

defendants on the hostile work environment and retaliation claims, leaving only her Equal Pay

Act claim (which was brought against Drexel alone).  As a sanction for disobeying its Orders

during discovery, the Court found Drexel liable for violating the Equal Pay Act, and a separate

trial was scheduled to determine damages.  *See Piety Foley v. Drexel Univ.*, 2025 WL 1019781,

at *1-4 (E.D. Pa. April 4, 2025).

At trial, the jury determined that Drexel's violation was willful and, on the Special

Verdict Form developed by the parties, selected four appropriate comparators of seven possible

options; given the jury's verdict, the parties stipulated to damages in the amount of $354,993.42.

*See id.* at *4-5.  Drexel has appealed, and the Court has stayed the execution of the judgment

pending that appeal, which is ongoing.  *See* Order Staying Judgment, Case No. 22-cv-1777, ECF

280 (E.D. Pa. Mar. 10, 2025).

### B.  Drexel's Alleged Retaliation

In her First Amended Complaint, which is the operative pleading here, Piety Foley

alleges that Defendants have been engaged in a campaign of "ongoing retaliation" against her

"for filing suit against Drexel for sex discrimination;" "for exposing Drexel's illegal sex-based

pay disparities in open court;" and, for "defeating Drexel at a jury trial."  According to Piety

Foley, these retaliatory acts were intended "to marginalize, frustrate, and humiliate" her, and

ultimately to "drive her to quit" her job at Drexel.  Specifically, she alleges nine discrete

incidents of retaliation, each of which is detailed below in chronological order.

### i.    Settlement Offers

Before the 2022 lawsuit was filed, Piety Foley presented Drexel with what she calls a "modest" pre-suit demand that included anti-bullying training for the professors in her Department, a salary audit and adjustment, limited sabbatical leave, and $50,000 in emotional-distress damages, stating as well that she was "open to discussion" about the terms. Drexel "refused even to discuss" the proposal, which compelled her to commence litigation on May 9, 2022.

From that point forward, Drexel insisted that any resolution of the case (short of trial) must involve Piety Foley's resignation from her tenured post. As Drexel's outside counsel allegedly put it, this pre-condition "need[ed] to be crystal clear before" Drexel could even discuss mediation or settlement. Drexel maintained this position as late as January of 2025 when, "on the eve" of the damages trial on the Equal Pay Act claim, it offered her a settlement that required her to resign for only "a very modest amount of money." Piety Foley characterizes Drexel's settlement posture as a "bad-faith, illegal retaliatory effort" to force her out of the school and, since "tenure-track faculty jobs are rare," to effectively force her to "give up her entire career and livelihood."

### ii.    Litigation Tactics

Piety Foley also pleads that Drexel, to represent it in the prior lawsuit, retained a firm "known for its bullying and abusive and costly litigation tactics." Under the direction of Defendant Lee—Drexel's in-house counsel—the firm allegedly drove up costs "as a way of wearing [her] down" and of deterring other lawyers from assisting her. Examples of these "scorched earth" tactics include: a "baseless motion" to disqualify her husband as counsel; an

insistence that discovery materials be designated "Attorney's Eyes Only" so that she would be unable to meaningfully participate in her own defense; preventing Piety Foley from accessing accurate pay data during discovery; and, submitting "fraudulent sworn affidavits" to the Court. In Piety Foley's telling, these tactics were employed not for legitimate defense purposes but instead "to retaliate," to force her to abandon her lawsuit, and "to send a message that suing Drexel will cost employees dearly . . . ."

### iii.    Lack of Support for Conference

During the 2023-24 academic year, while the prior litigation was ongoing, Piety Foley organized a philosophy conference jointly hosted by Drexel and Yale University to be held in December of 2024.  In March of that year, Piety Foley requested and was promised funding for the conference from Defendant Brown, the Dean of Drexel's College of Arts and Sciences, and John Fry, Drexel's then-President.  She was concerned, though, that Brown and Fry did not know about her lawsuit against the school—so, she "dutifully informed" Brown, and asked him to pass the message on to Fry.

After notifying Brown about the suit, however, she experienced "trouble obtaining the conference funding" that was promised her.  Darius Graziani, Drexel's Executive Director of Finance and Administration, allegedly at the direction of Brown, failed to promptly respond to Piety Foley's emails about the logistics for securing the money.  Brown and Fry also refused to pay to set up a webpage for the conference on Drexel's website, despite the College of Arts and Sciences having "its own promotional staff precisely to promote" events like the conference. She alleges that the slow-rolling she received from Brown, Fry, and Graziani was intended as retaliation for her lawsuit against the school.

Although Piety Foley was eventually "able to sort out the funding issues," the prolonged

4

process resulted in the delayed procurement of customized tote bags purchased for the

conference—instead of being able to hand them out to participants at the conference itself, Piety

Foley had to individually mail the bags to participants after the fact.  Because of the tote bag

ordeal, she "fear[s] she may be perceived as ineffectual and disorganized by the many scholars

who attended the conference . . . ."

### iv.    Faculty Annual Review Scores

Piety Foley alleges that her 2024 Faculty Annual Review—which she received while the

prior litigation was ongoing—was intentionally lowered without cause in retaliation for her

lawsuit.  Defendant Kurtz, Head of the Department of English and Philosophy, gave Piety Foley

a score of "3" (on a scale of "1" to "5") in the "teaching" category, although her student course

evaluations rated her, on average, as slightly above a "4."  Further, Kurtz gave her a "4" in the

"scholarship" category, notwithstanding a record of scholarship that well exceeded the

publication requirements for tenure-line faculty.  Piety Foley pleads that no legitimate

explanation was offered for these changes, and that the lower scores caused her "humiliation and

frustration;" "endanger[ed] her standing at Drexel," since these ratings are "the only impression"

that university administrators have of the quality of her work; and, potentially reduced her

eligibility for future merit raises.

### v.    Refusal to Publicize Professional Accomplishments

As Head of the Department of English and Philosophy, Defendant Kurtz "has a practice

of distributing 'kudos' emails announcing faculty accomplishments, such as their presentations at

conferences, publications, publishing contracts, awards, and nominations for awards."  Piety

Foley alleges that, during the pendency of the first lawsuit, Kurtz "refus[ed] to publicize her

most important accomplishments," including an invitation to be a keynote speaker—"a rare

honor"—at a conference to be held in the summer of 2026.  When asked the reason why, Kurtz responded that the events for which Piety Foley sought kudos were "too far" in the future to warrant publicizing.

Kurtz also failed to highlight her accomplishments "in a document the Dean's office had distributed to all faculty in the College of Arts and Sciences," and even when Piety Foley submitted her accomplishment directly to Defendant Brown (the Dean of that College) for inclusion in the mailer, he refused to redistribute the document with her accolades included.

Finally, a few days after the jury's verdict in the first lawsuit, Defendant Brown agreed to publicize the news about her keynote address at the 2026 conference.  However, as of June of 2025, "he has still not" done so.  Piety Foley alleges that each of these were acts of retaliation "crafted by Defendants Kurtz, Brown, and upon information and belief, Defendant Lee" intended to "diminish her status and standing at Drexel" and ultimately force her to quit.

### vi.    Failure to Raise Salary After Trial

As described above, Piety Foley recovered over $350,000 on her Equal Pay Act claim at trial, where a jury determined that Drexel willfully violated the statute by paying her less than male colleagues without a legally-protected reason.  Shortly after trial, Piety Foley approached the Dean of the College of Arts and Sciences, Defendant Brown, requesting a meeting to discuss prospectively raising her salary in accordance with the jury's verdict.  Brown "said he would get back to her after he took up the matter with the head of [Human Resources] and university counsel," the latter of which Piety Foley took to mean Defendant Lee.  However, despite "purportedly conferring" about the matter, Brown "has not further communicated with [her] about [the] issue and has not raised her salary."  Piety Foley alleges that the refusal to raise her salary is an intentional act of sex-based discrimination taken in retaliation for her victory at trial.

### vii.    *Refusal to Appoint as Program Director*

Drexel's Religious Studies program has lacked a Director "for several years," and Piety Foley is the only faculty member to have volunteered for the position. Nevertheless, Dean Brown—allegedly following a strategy devised by Defendant Lee—"continues to refuse" to appoint her, despite strong faculty support. Brown also refuses to advance her proposal to rename and expand the program, changes she alleges would boost student enrollment. Although Brown emailed Piety Foley shortly before the trial in the prior lawsuit indicating that he would "get back to her" on this topic, as of June of 2025 he has not yet responded. Piety Foley alleges that this refusal is another act of retaliation against her for suing Drexel.

### viii.    *Spring 2025 Course Schedule Changes*

Piety Foley alleges that, fewer than two weeks after her victory at trial in the prior case, Drexel effectively "banished her from campus" by converting her Spring 2025 courses—most notably an upper-level Philosophy of Religion seminar—from face-to-face instruction to remote, "online/asynchronous" format without notice. Piety learned of the switch "by accident;" she had not been consulted about the change nor informed of it directly but instead discovered it when she chose to affirmatively review her department's course listings in the weeks before the Spring 2025 semester began. Had she not done so, she would have entered the term unprepared, endured poor student evaluations, and suffered a negative annual review. And these changes were no minor bothers—re-tooling her upper-level seminar on such short notice would have required the onerous task of prerecording lectures and developing entirely new assessments, tasks that cannibalized time she planned to use for her scholarship. Indeed, as Piety Foley explains, last-minute schedule changes are a known method of harassment in academia precisely because they force additional course preparations and disrupt research plans.

Piety Foley appealed to her supervisors for an explanation.  Program Director Amato claimed the change was a "mistake," while Defendant Kurtz (the Head of the Department of English and Philosophy) said that Defendant Brown (the Dean of College of Arts and Sciences, which contains her Department) had ordered it—conflicting stories that Piety Foley sees as evidence of retaliatory motive.  To make it up to her, Amato offered Piety Foley a choice between teaching two large introductory courses or a Friday afternoon seminar on Emmanuel Kant—options she alleges were logistically and pedagogically untenable.  Ultimately, compelled to regain a campus presence, Piety Foley reluctantly agreed to teach the two large introductory courses, which entail heavier grading loads and less prestige than the classes she expected to teach that semester.  Piety Foley characterizes the entire episode as a multi-step plan to disrupt her research schedule and force her off campus in retaliation for her success in the first lawsuit.

### ix.    *Refusal to Appoint for By-Laws Committee*

In March of 2025—after the trial verdict—Kurtz sent an email to faculty in his Department soliciting volunteers for an ad hoc committee to review the Department's by-laws. Although Piety Foley volunteered immediately, Kurtz did not appoint her; instead, he sent her an impersonal "form-letter" email declining the appoint her on the grounds that "a good number of people" expressed interest in serving on the committee and not all could be given positions. Piety Foley doubts that "so many professors applied to be on this committee such that [Kurtz] could not personally email the ones he was rejecting and instead had to write a 'form-letter' rejection email" because committee work "is unpopular in the Department."  She alleges that Kurtz styled his email in the way he did in order to obfuscate his true motive for declining to appoint her—to retaliate against her by depriving "her of opportunities to take on administrative work and hence advance within the institution."

## II.    LEGAL STANDARDS

Defendants move to dismiss Piety Foley's Amended Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  The plaintiff is obliged to provide something "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.

In deciding a Rule 12(b)(6) motion, a court "consider[s] the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff," *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000), with the question being "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief," *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (citation omitted). Furthermore, "factual and legal elements of a claim should be separated," with the former "accept[ed] . . . as true" and the latter "disregard[ed]" where not supported by well-pleaded facts. *Fowler*, 578 F.3d at 210 (citations omitted).

## III.    DISCUSSION

Piety Foley's retaliation claims are brought under two federal statutes.  The first is the Equal Pay Act of 1963 ("EPA"), under which she previously sued and recovered.  *See* 29 U.S.C. § 206(d) ("No employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees at a rate less than the rate at which he pays wages to employees of

the opposite sex . . . .").  The second is Title IX of the Education Amendments of 1972 ("Title

IX"), which makes it illegal for a school "receiving Federal financial assistance" to discriminate

on the basis of sex.[1]  20 U.S.C. § 1681.  Both statutes prohibit retaliation against an individual

who makes a complaint about discriminatory treatment.  *See* 29 U.S.C. § 215(a)(3) (Under the

EPA, "it is unlawful for any person . . . [to] discriminate against any employee because such

employee has filed any complaint or instituted . . . any proceeding under or related to this

chapter . . . ."); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005) ("Retaliation

against a person because that person has complained of sex discrimination is another form of

intentional sex discrimination encompassed by Title IX's private cause of action.").

In the Third Circuit, EPA and Title IX retaliation claims are both analyzed under the

familiar Title VII retaliation framework.  *See Carlson v. Qualtek Wireless, LLC*, 2023 WL

5094566, at *3 (3d Cir. Aug. 9, 2023) (in case of first impression, joining sister circuits in

applying Title VII framework to EPA retaliation claim); *Doe v. Mercy Catholic Med. Ctr.*, 850

F.3d 545, 564 (3d Cir. 2017) ("Title VII's familiar retaliation framework generally governs Title

IX retaliation claims." (internal quotations omitted)).  Under that framework, a plaintiff will

survive a motion to dismiss if "she pleads sufficient factual allegations to raise a reasonable

expectation that discovery will reveal evidence of the following elements: (1) she engaged in

[protected] conduct . . . ; (2) the employer took adverse action against her; and (3) a causal link

exists between her protected conduct and the employer's adverse action."  *Connelly v. Lane

Const. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016).

Piety Foley alleges that each of the nine acts canvassed in the foregoing Factual

Background section constitute adverse actions taken against her by Defendants; in other words,

---

[1] Piety Foley brings her EPA claims against all Defendants, and her Title IX claims against Drexel only.

she claims that she was retaliated against on nine different occasions and in nine different ways. But separately and in addition to her claims for discrete, incident-by-incident retaliation, Piety Foley also brings claims for "retaliatory hostile work environment"—*i.e.*, the claim that, when all of Defendants' alleged actions are considered *in toto*, they collectively constitute a hostile work environment, which independently violates the anti-retaliation provisions of the EPA and Title IX.  *See Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006), *abrogated on other grounds by Burlington N. v. White*, 548 U.S. 53 (2006) (recognizing retaliatory hostile work environment claim in the Title VII context).  In the Third Circuit, a plaintiff bringing a retaliatory hostile work environment claim must plausibly plead the elements of the "usual [discriminatory] hostile work environment framework"—namely, that "(1) she suffered intentional discrimination because of her protected activity; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present."  *Komis v. Sec'y of the United States DOL*, 918 F.3d 289, 293 (3d Cir. 2019) (citing *Jensen*, 435 F.3d at 449).[2]

Since the frameworks governing Piety Foley's discrete retaliation and retaliatory hostile work environment claims are different, the claims will be considered in turn, beginning with the discrete retaliation claims.

### A.  Discrete Retaliation

As stated above, to state a claim for a discrete act of retaliation Piety Foley must plausibly plead that: "(1) she engaged in [protected] conduct . . . ; (2) [Defendants] took adverse

---

[2] The Third Circuit has recognized that the "material adversity" standard set forth by the Supreme Court in *Burlington Northern* "potentially" applies in retaliatory hostile work environment claims, instead of the "usual [discriminatory] hostile work environment framework" set forth above.  *Komis*, 918 F.3d at 291, 293.  Here, however, the parties do not dispute that the latter standard applies.  *See also Watkins v. Pa. Dep't of Corr.*, 2023 WL 5925896, at *2 (3d Cir. Sept. 12, 2023) (after *Komis*, continuing to apply the standard hostile work environment framework to retaliatory hostile work environment claim).

action against her; and (3) a causal link exists between her protected conduct and [Defendants']
adverse action."  *Connelly*, 809 F.3d at 789.  The parties do not dispute that Piety Foley's prior
lawsuit is conduct protected by the relevant laws; their disagreements involve solely whether any
of Defendants' alleged acts constitute adverse actions, and whether there exists a causal link
between any of act and the previous lawsuit.  To make that determination, each alleged act of
retaliation is considered below.

### i.    *Settlement Offers and Litigation Tactics*

Piety Foley alleges that Defendants retaliated against her for filing a lawsuit by refusing
to settle that suit unless she resigned from her post at Drexel but never offered her enough money
to make resignation worth her while.  She also alleges that Drexel engaged in retaliatory
"scorched earth" litigation tactics.  Drexel, for its part, argues that neither of these constitute
"adverse actions."  An adverse action is any action that "well might have dissuaded a reasonable
worker from making or supporting a charge of discrimination" against their employer.
*Burlington N.*, 548 U.S. at 68 (citation modified).  Drexel's position is that settlement offers and
litigation tactics, as a conceptual matter, "cannot fit into the category of retaliatory actions" since
"they are not punitive measures that dissuade protected activity, but rather are responses to such
protected activity," with settlement offers being "aimed at resolving disputes" and litigation
tactics, however hard-nosed, being simply "a routine part of litigation."

Third Circuit precedent supports Drexel's position.  In *Smith v. City of Atlantic City*, the
plaintiff argued that his employer retaliated against him by denying his request for a religious
exemption from its grooming policy, which forbade its employees "from growing a beard of any
length."  *Smith v. City of Atl. City*, 138 F.4th 759, 768, 775-76 (3d Cir. 2025).  The Third Circuit
noted that "the approval or denial of any accommodation request . . . is an anticipated part of the

process," such that "anyone entering the process . . . does so knowing of the potential for denial." *Id.* at 776. "In other words," it reasoned, because "the potential for denial does not dissuade employees from seeking an accommodation" in the first place, "[i]t follows that the realization of that known potential does not transform the denial into a dissuasive action." *Id*.

So too here. A settlement offer—no matter how offensive it may be to a litigant—"is an anticipated part" of a lawsuit. *Id.* As such, the mere prospect of receiving a settlement offer cannot be said to reasonably dissuade an employee from "making or supporting a charge of discrimination" by filing a lawsuit. *Burlington N.*, 548 U.S. at 68; *see also Lowe v. Delta Air Lines Inc.*, 730 F. App'x 724, 730 (11th Cir. 2018) ("The act of making a settlement offer does not constitute harassment, and a litigant can offer whatever settlement terms it wants." (citation modified)). Indeed, just the opposite is true: the prospect of settlement may actually encourage an employee to file a lawsuit, rather than dissuade them from doing so. For these reasons, Drexel's settlement offers do not constitute "adverse actions," and therefore cannot form the basis of a successful discrete retaliation claim against Defendants.

The same goes for Drexel's litigation tactics in the previous lawsuit. Piety Foley alleges that Drexel, in retaliation for her lawsuit, filed a "baseless motion" to disqualify her husband as counsel; insisted that discovery materials be designated "Attorney's Eyes Only;" prevented her from accessing accurate pay data during discovery; and, submitted "fraudulent sworn affidavits" to the Court. She and her counsel were then "forced to spend time and money wading through these lies and exposing them in discovery and at trial . . . ." However, litigation is expected to involve motion practice, discovery disputes, and sometimes even wily behavior by opposing counsel. That a litigant will have to "spend time and money" litigating a case is not evidence of discriminatory retaliation—it is par for the course. Furthermore, to the extent hardball tactics

used in this first litigation crossed the line into sanctionable behavior, Drexel (and Piety Foley, for that matter) have already been penalized for their conduct in the prior lawsuit. *See Piety Foley v. Drexel Univ.*, 2025 WL 1019781, at *3 (explaining that Drexel was sanctioned with a finding of liability on Piety Foley's Equal Pay Act claim for failing to obey the Court's Orders); *Piety Foley v. Drexel Univ.*, 2025 WL 2177808, at *9 (reducing Piety Foley's attorney's fee award "due to Piety Foley's unnecessarily contentious litigation posture"). Here, both Piety Foley's and Drexel's counsel similarly prolonged this litigation unnecessarily. Indeed, as Judge Pratter put it, both sides "abused this case, abused the procedures, and abused each other." In her words, both sides "really pushed the envelope in this case, and it is really not a good example of the way cases should be handle. . . ." To give specifics, Judge Pratter criticized the attorneys for "abusing" and disrespecting the Special Discovery Master who had been appointed to assist the parties. Later, in the deposition of Roger Kurtz, counsel for both parties spent nearly ten pages quibbling over a single objection. *Piety Foley v. Drexel Univ.*, 2025 WL 2177808, at *8 (E.D. Pa. July 31, 2025).

This is not to say, of course, that conduct by a party or their counsel during litigation can never constitute an adverse action for the sake of the retaliation analysis; it is simply the case that this is not that. Here, Piety Foley does not allege that Defendants engaged in conduct that would dissuade a reasonable employee from filing suit or otherwise complaining of discrimination. *See Burlington N.*, 548 U.S. at 68. Accordingly, her discrete retaliation claim cannot proceed on the basis of Drexel's litigation tactics in the prior suit.

### ii.    Support for Conference, Kudos Emails, Program Director Position, and Committee Membership

Piety Foley alleges that Defendant Brown, the Dean of Drexel's College of Arts and Sciences, instructed his staff to withhold money from Piety Foley that his office had promised

her for a joint conference with Yale University.  Although she did in fact received the money she was promised, the delays resulted in the tardy delivery of custom tote bags she had ordered for conference participants.  She also alleges that Drexel refused to host a custom website for the conference.

These allegations are insufficient to ground a retaliation claim because they do not involve any action serious enough to dissuade a reasonable employee from "making or supporting a charge of discrimination" by filing a lawsuit.  *Burlington N.*, 548 U.S. at 68. Although the money Piety Foley was promised for the conference was slow to arrive, she eventually did receive all of it in time to use it for the conference.  The inconvenience she experienced in procuring that money, as well as the website situation and the tote bag shipment, are inconveniences akin to "those petty slights or minor annoyances that often take place at work and that all employees experience"—not materially adverse actions.  *Burlington N.*, 548 U.S. at 68; *see also Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998) (explaining that antidiscrimination laws are not "a general civility code for the American workplace"). Accordingly, Piety Foley has not stated a discrete retaliation claim with regard to the Yale conference.

The same is true for Piety Foley's allegations that Defendants failed to circulate "kudos" emails sharing her accomplishments; failed to name her the Program Director of the Religious Studies program; and, failed to appoint her to an ad hoc by-laws review committee.  Even taking the allegations in the light most favorable to her, Piety Foley does not plausibly plead that any of these accolades or positions "contribute[] significantly to [her] professional advancement" such that being denied them would deter a reasonable employee in her shoes from reporting discrimination.  *Burlington N.*, 548 U.S. at 69.  The closest she comes to doing so is to plead that

15

Defendants have generally sought to deprive "her of opportunities to take on administrative work and hence advance within the institution," but this allegation is not enough because she does not allege how any of the foregoing accolades or positions would plausibly advance her standing at the university such that they rise to the level of an adverse action. Without allegations to that effect, it would not be reasonable to draw the inference that being denied "kudos" emails, a chance to serve as Program Director for a program that has "been without a director for many years," or "unpopular" committee work are anything more than "petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington N.*, 548 U.S. at 68. Accordingly, Piety Foley fails to state a claim for discrete retaliation with regard to any of these acts.

### iii.    *Faculty Annual Review Scores*

Piety Foley alleges that Defendant Kurtz gave her lower-than-merited scores on her 2024 Faculty Annual Review. Specifically, she was given a "3" out of "5" in the "teaching" category and a "4" in the "scholarship" category, when she allegedly should have received roughly one point higher in each category. She pleads that these scores caused her "humiliation and frustration;" "endanger[ed] her standing at Drexel," as these scores are "the only impression" that university administrators have of the quality of her work; and, potentially reduced her eligibility for future merit raises.

Drexel argues that these scores do not constitute an adverse action because "no reasonable employee would be dissuaded from engaging in protected activity because of such scores." It points to Piety Foley's own allegation that a "4" is "a good score," and argues that she otherwise "makes no factual averments" that her scores "would lead to any tangible adverse consequences." Indeed, as Drexel notes, Piety Foley pleads only that she feels "stress and

16

anxiety" that the scores may adversely affect her in the future—not that the scores have actually had any effect on her professional standing. But the Supreme Court has made clear that anti-retaliation provisions are designed to "protect[] an individual not from all retaliation, but from retaliation *that produces an injury or harm*." *Burlington N.*, 548 U.S. at 67. Since Piety Foley has not identified any tangible injury or harm that has resulted or plausibly will result from these scores, there is no basis for determining that they could have such an impact on an "employee's professional advancement" that they "might well deter a reasonable employee from complaining about discrimination." *Id.* at 69. Accordingly, Piety Foley's allegations fail to state a claim for retaliation with regard to her Faculty Annual Review scores. *See Morrison v. Carpenter Tech. Corp.*, 193 F. App'x 148, 154 (3d Cir. 2006) (finding that a "corrective performance review" was not an adverse action where plaintiff did "not identify, much less establish, any harm or injury produced by" it).

#### iv.    *Failure to Raise Salary After Trial*

Piety Foley alleges that, after her success at trial on her Equal Pay Act claim, she asked Defendant Brown to prospectively raise her salary in accordance with the jury's verdict. Brown "said he would get back to her after he took up the matter with the head of [Human Resources] and university counsel," the latter of which Piety Foley took to mean Defendant Lee. However, despite "purportedly conferring" about the matter, Brown "has not further communicated with [her] about [the] issue and has not raised her salary." Drexel argues that, because both parties are currently appealing the outcome of the prior litigation—and, more importantly, because the Court has stayed execution of the judgment pending the outcome of those appeals, in accordance with Federal Rule of Civil Procedure 62(b)—it would be "entirely premature" for it to raise her salary before those appeals are decided.

To put this issue in the terms of the adverse action analysis, the operative question is whether a reasonable employee would be dissuaded from complaining about discrimination by the prospect that, if the employee won an Equal Pay Act suit at trial and the trial court stayed the execution of the judgment pending appeal, her employer would not raise her salary to reflect that verdict until the verdict became final post-appeal. *See Burlington N.*, 548 U.S. at 68. Piety Foley cites no authorities suggesting that the answer to this question should be anything other than a 'no.' *See Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997) ("[A]n argument consisting of no more than a conclusory assertion . . . will be deemed waived." (citation omitted)). Accordingly, she fails to state a claim for retaliation on the basis of her salary not being raised while the judgment in the prior case is stayed pending appeal.

### v.    *Spring 2025 Course Schedule Changes*

Finally, Piety Foley alleges that, at the "last minute" before classes began, Drexel converting her Spring 2025 courses from face-to-face instruction to remote, "online/asynchronous" format without notice. Since reworking her courses on such short notice would have required the creation of prerecorded lectures and the development of entirely new student assessments, she reluctantly agreed to teach two large introductory courses on campus instead. She also alleges that each of the classes she was assigned had unusually high "enrollment caps"—*i.e.*, a maximum number of students permitted to take the class—which, she pleads, means that the classes are more likely to be cancelled for under-enrollment. Piety Foley alleges that all of these schedule changes were orchestrated to disrupt her research schedule and "banish" her from campus in retaliation for her success in her lawsuit.

Defendants do not dispute that changing a professor's classes from an in-person to an online format can constitute an adverse action. Instead, they argue that the First Amended

Complaint "lacks any factual basis to suggest that [they] have attempted to keep [her] off campus." While it is true that, under Piety Foley's own allegations, she did end up teaching on campus during the Spring 2025 semester, whether or not she was literally "banish[ed]" from campus is not the relevant inquiry. What matters is whether or not a reasonable professor would be dissuaded from complaining of discrimination if they knew that, at the last minute, their supervisor would change their classes from in-person instruction to remote instruction. And given the fact that Defendants do not dispute that this could be, Piety Foley has established an adverse action for the sake of the retaliation analysis. *See Burlington N.*, 548 U.S. at 68.

The question, then, becomes whether there exists "a causal link" between Piety Foley's lawsuit and her schedule change. *Connelly*, 809 F.3d at 789. The "temporal proximity" between the protected activity and adverse employment action can establish causation if that temporal proximity is "unusually suggestive." *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 221 (3d Cir. 2017) (quotation omitted). Here, Piety Foley alleges that her schedule was changed less than two weeks after the jury returned a verdict in her favor in the trial. That temporal proximity is close enough to raise the inference of causation, and Defendants do not argue otherwise. *See id.* ("An inference of unduly suggestive temporal proximity begins to dissipate where there is a gap of three months or more between the protected activity and the adverse action." (quotation omitted). With this third and final element satisfied, then, Piety Foley has stated a claim for discrete retaliation with regard to last-minute changes to her Spring 2025 course schedule.

Finally, Defendants argue that, if Piety Foley has stated a claim for retaliation with regard to the schedule change, she has only done so against Drexel itself, and not any of the Individual Defendants—namely, Defendants Kurtz (Head of the Department of English and Philosophy), Brown (Dean of the College of Arts and Sciences), and Lee (Drexel's in-house counsel).

With regard to Kurtz, the First Amended Complaint contains two substantive factual allegations about his involvement in scheduling. The first allegation is a quote from Kurtz's deposition testimony from the prior lawsuit where he says, as a general matter, that he is "ultimately the one who is responsible for scheduling across the whole department." The second is the allegation that, after discovering the schedule change, Piety Foley "appeal[ed]" to Kurtz via email, who reported that he had "double checked this issue with the [D]ean's office, who are the ones wanting it to be online in the first place." Drexel argues that the fact that Kurtz is the final decisionmaker in matters of scheduling does not mean that he himself was the one responsible for changing Piety Foley courses from in-person to online. But at the Motion to Dismiss stage, where all reasonable inferences must be drawn in favor of Piety Foley, that conclusion is a reasonable one to draw based on her allegations. Accordingly, she states a claim against Kurtz individually.

With regards to Brown—the Dean whose office purportedly ordered the schedule change—Piety Foley's allegations are likewise sufficient to state a claim for individual liability. As described above, Kurtz reported that it was the Dean's office who wanted Piety Foley's class "to be online in the first place." Drexel argues that the allegation that "the Dean's office" ordered the change does not mean that Brown—the Dean—*himself* ordered the change. But the inference that he was indeed the one to order the change is a reasonable one to draw here, especially because Piety Foley separately pleads that schedule changes are rarely ordered by Deans' offices, suggesting that Brown—who "was aware of both the lawsuit and the judgment"—ordered the change himself in an act of retaliation. Accordingly, this claim may proceed against Brown individually.

Finally, regarding Lee, Piety Foley pleads that, "upon information and belief," he "was

20

also involved in this decision," and that it "was part of [his] illegal strategy to retaliate against [her] for filing her sex discrimination lawsuit." While a plaintiff's well-pleaded factual allegations must be taken as true at this stage, *Fowler*, 578 F.3d at 210, this allegation is really just a legal conclusion—*i.e.*, the conclusion that Lee is liable for retaliation—masquerading as a fact. Piety Foley pleads no facts to plausibly suggest that Lee has ever overseen course scheduling for any professor, let alone for her specifically. Without allegations to that effect, she fails to state a claim against Lee individually.

### B. Retaliatory Hostile Work Environment

As described previously, in addition to her discrete retaliation claims, Piety Foley also brings claims for "retaliatory hostile work environment"—*i.e.*, the claim that, when all of Defendants' allegedly retaliatory actions are considered as a whole, they collectively constitute a hostile work environment. *See Jensen*, 435 F.3d at 449 (recognizing retaliatory hostile work environment claim in the Title VII context). In the Third Circuit, a plaintiff bringing a retaliatory hostile work environment claim must plausibly plead the elements of the "usual [discriminatory] hostile work environment framework"—namely, that "(1) she suffered intentional discrimination because of her protected activity; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present." *Komis*, 918 F.3d at 293.

Here, Drexel argues that the alleged retaliatory acts, even when considered *in toto*, do not constitute "severe or pervasive" harassment. "[S]evere" harassment and "pervasive" harassment are not the same thing. The terms represent two distinct types of hostile work environment claims. *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017). "[S]ome harassment may be

severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive." *Id.* Thus, in certain circumstances, a single, severe incident can support a hostile work environment claim. *Id.* at 265. But in other cases, plaintiffs seek to remedy "the cumulative effect of a thousand cuts"— *i.e.*, pervasive acts of harassment "which are not individually actionable" but "may be aggregated to make out a . . . claim." *O'Connor v. City of Newark*, 440 F.3d 125, 127-28 (3d Cir. 2006).

When analyzing whether allegations of harassment are "severe" or "pervasive," the "totality of the circumstances" must be considered "rather than pars[ing] out the individual incidents." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 168 (3d Cir. 2013); *see also Qin v. Vertex, Inc.*, 100 F.4th 458, 471 (3d Cir. 2024) (directing courts to "concentrate not on individual incidents, but on the overall scenario" (quotation omitted)). In so doing, several factors are to be balanced, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

### *i.    Severity*

Turning first to the question of severity, the Third Circuit has vindicated severe harassment hostile work environment claims only when they are predicated on "extremely serious" misconduct, *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005), such as the use of racial slurs accompanied by threats of termination, or sexual harassment and assault. *See, e.g., Castleberry*, 863 F.3d at 265-66 ("Plaintiffs alleged that their supervisor used a racially charged slur in front of them and their non-African-American coworkers. Within the same breath, the use of this word was accompanied by threats of termination (which ultimately

occurred). This constitutes severe conduct that could create a hostile work environment."); *Starnes v. Butler Cnty. Ct. of Com. Pl., 50th Jud. Dist.*, 971 F.3d 416, 428 (3d Cir. 2020) (finding severe harassment where the plaintiff's supervisor "coerced her into engaging in sexual relations, shared pornography with her, asked her to film herself performing sexual acts, engaged in a pattern of flirtatious behavior, scolded her for speaking with male colleagues, assigned her duties forcing her to be close to him, and treated her differently than her male colleagues"); *Moody*, 870 F.3d at 215 (finding severe harassment where the plaintiff's employer "made sexually charged comments to her;" "grabbed her" and "attempted to take her shirt off;" "called her into his office, and when she entered" encountered him "sitting naked on a chair;" and, "sent her a text message stating 'am I getting all three holes' and thereafter showed up at her house uninvited and pressured her into having sex with him by threatening her job"); *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 146-47 (3d Cir. 1999) (finding severe harassment where a supervisor told the plaintiff that she "made too much money" for a woman, belittled her, and "grabbed [her] buttocks from behind while she was bending over her files and told her that she smelled good").

Here, the retaliatory acts Piety Foley alleges fall well short of this standard. She does not allege that she was physically assaulted, sexually harassed, or called a slur of any sort. In fact, other than glancingly referring to the Defendants' alleged acts as "abusive" in her briefs, Piety Foley makes no argument (and cites no authorities) that she was subject to "severe" harassment in retaliation for filing her lawsuit. Considering the factual mismatch between the Third Circuit precedents recounted above and her allegations here, as well as her reticence on this point, Piety Foley has not stated a claim for a severe hostile work environment.

### ii. *Pervasiveness*

Pervasive harassment is demonstrated by "a continuous period" of misconduct.

*Drinkwater v. Union Carbide Corp.*, 904 F.2d 853, 863 (3d Cir. 1990). Factors to be considered in determining whether ongoing harassment is "pervasive" include whether the harassment is "physically threatening or humiliating;" its frequency; and, "whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

As explained above, the conduct Piety Foley alleges was not "physically threatening or humiliating." *Id.* Although she claims that she felt embarrassment when, for instance, she had to mail out the tote bags to conference participants after the fact (as opposed to being able to distribute them at the conference itself), she cites no authority to explain why the Defendants' alleged acts were "objectively" offensive, as opposed to merely "subjectively" bothersome, as is required to state a claim for a hostile work environment. *Id.* at 21-22.

Nor was the alleged retaliation frequent enough to establish pervasiveness. Piety Foley alleges nine acts of retaliation which occurred over the course of three years. Hostile work environment claims involving even more frequent harassment have been rejected as insufficiently pervasive. *See, e.g., Hamera v. County of Berks*, 248 F. App'x 422, 425-26 (3d Cir. 2007) (affirming district court's conclusion that the plaintiff failed to show that the allegedly harassing comments were pervasive as a matter of law where his coworkers "made nine comments over a year and four months"); *Nitkin v. Main Line Health*, 67 F.4th 565, 571 (3d Cir. 2023) ("[T]he seven comments [Plaintiff] identified were spread out over a span of over three-and-a-half years. The relative infrequency of [Defendant's] remarks—reflecting one or two statements in a given six-month period—indicates that his actions were not severe or pervasive harassment."); *Stephenson v. City of Philadelphia*, 2006 WL 1804570, at *11 (E.D. Pa. June 28, 2006), *aff'd*, 293 F. App'x 123 (3d Cir. 2008) ("[Plaintiff] presents nine specific occurrences over nineteen months in support of her claim of a hostile work environment. However, these

incidents collectively lack the frequency to constitute a hostile work environment claim."); *Cooper-Nicholas v. City of Chester, Pa.*, 1997 WL 799443, at *3 (E.D. Pa. Dec. 30, 1997) (regarding eight alleged incidents of unwelcome comments over nineteen months as neither "frequent or chronic").  Since Piety Foley offers no countervailing authorities, these cases control, and the frequency factor weighs against finding that she has alleged a pervasive hostile work environment.

Finally, the alleged retaliatory acts were not so abusive as to "unreasonably interfere[] with" Piety Foley's "work performance."  *Harris*, 510 U.S. at 23.  Even considering the "totality of the circumstances," *Mandel*, 706 F.3d at 168—*i.e.*, summing up the impact of all nine of the retaliatory acts that she alleges—Piety Foley has not put forth allegations suggesting that her workplace was so "permeated with discriminatory intimidation, ridicule, and insult" such that she could not complete her work as a professor, *Harris*, 510 U.S. at 21, or that the harassment she experienced "alter[ed] the conditions of [her] employment and create[d] an abusive working environment," as is necessary to make out a hostile work environment claim.  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (quotation omitted).  Instead, Piety Foley's allegations "illustrate workplace conflict," not abuse.  *Culler v. Sec'y of United States Veterans Affairs*, 507 F. App'x 246, 250 (3d Cir. 2012) (upholding dismissal of hostile work environment claim where plaintiff alleged his supervisor "denied requests for training and leave, denied him assistance in pursuing professional certification, removed equipment and patient records from his work area, attempted to inaccurately revise his job description, inappropriately suspended him, and refused to pay him overtime").  Accordingly, all factors weigh in favor of finding that Piety Foley has not alleged harassment that was severe or pervasive and thus has not stated a retaliatory hostile work environment claim.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss will be granted in part and denied in part.  The Motion will be denied with respect to Piety Foley's discrete retaliation claims involving the changes to her Spring 2025 course schedule, in violation of the Equal Pay Act and Title IX.  Those claims may proceed, but only against Defendants Drexel, Kurtz, and Brown.  In all other respects, Defendants' Motion to Dismiss will be granted, and the remainder of her claims will be dismissed without prejudice.  Finally, Drexel's Motion to Strike will be denied as moot.[3]

An appropriate order follows.

BY THE COURT:

S/ WENDY BEETLESTONE

_____

WENDY BEETLESTONE, C.J.

---

[3] Drexel has moved to strike the portions of the First Amended Complaint containing allegations related to its settlement offers and litigation tactics.  Because all claims stemming from those facts have been dismissed, the Motion to Strike those facts will be denied as moot.  *See Raciti v. Rushmore Loan Mgmt. Servs.*, 412 F. Supp.3d 462, 472 (D.N.J. 2019) (denying motion to strike as moot where allegations in question were solely relevant to claims that were dismissed).