IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARILYN GAYE PIETY FOLEY,**<br>**Plaintiff,** | | **CIVIL ACTION** |
| **v.** | | |
| **DREXEL UNIVERSITY, DAVID S.**<br>**BROWN, and ROGER KURTZ,**<br>**Defendants.** | | **NO.  25CV2103** |

## MEMORANDUM OPINION

This lawsuit is the most recent chapter in a saga that pits a respected philosophy professor against the prestigious university at which she holds tenure as well as her department colleagues. Plaintiff Marilyn Gaye Piety Foley has been employed as a philosophy professor in Drexel University's College of Arts and Sciences ("CoAS") since 1998.  In 2022, she sued Drexel and Roger Kurtz, the head of her academic department and her direct supervisor, asserting hostile work environment and retaliation claims under various state and federal antidiscrimination laws, as well as claims for breach of contract and violations of the Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1) ("EPA") ("*Piety Foley I*").  She later withdrew her breach of contract claim, and the Court granted summary judgment in Drexel and Kurtz's favor on the hostile work environment and retaliation claims, leaving only her Equal Pay Act claim against Drexel.

On the date set for trial, the Court entered an order sanctioning Drexel for failing to comply with its discovery Orders: the sanction was a finding that Drexel was liable under the Equal Pay Act.  Some months later, after a trial to determine whether Drexel's violation was willful as well as the amount of damages, s*ee Piety Foley v. Drexel Univ.*, 2025 WL 1019781, at *1-4 (E.D. Pa. Apr. 4, 2025), the jury found that Drexel's violation was willful, and the parties

stipulated to damages in the amount of $354,993.42. *See id.* at *4-5. Drexel appealed, and the Court stayed execution of the judgment pending resolution of that appeal, which remains ongoing. *See* Order Staying Judgment, Case No. 22-cv-1777, ECF No. 280 (E.D. Pa. Mar. 10, 2025).

Two months later, Piety Foley filed this action against Drexel and three Drexel employees: Kurtz; David S. Brown, the Dean of CoAS; and, Juhwon Lee, Drexel's in-house counsel. She alleges that Defendants engaged in a campaign of "ongoing retaliation" against her because of the prior lawsuit. According to Piety Foley, Defendants intended through retaliatory acts "to marginalize, frustrate, and humiliate" her and, ultimately, to "drive her to quit" her position at Drexel.

Piety Foley's Complaint identified nine discrete incidents of alleged retaliation. As to all Defendants, she asserted claims under the antiretaliation provision of the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3) ("FLSA"), which makes it unlawful for any person to "discriminate against any employee because such employee has filed any complaint or instituted . . . any proceeding under or related to this chapter." 29 U.S.C. § 215(a)(3). That provision encompasses retaliation for complaints asserting violations of the Equal Pay Act. *See Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 110 n.7 (2d Cir. 2015) ("An employer's retaliation for filing EPA complaints, like retaliation for filing FLSA complaints, is analyzed under section 215(a)(3)."). As to Drexel, she also asserted a retaliation claim under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681. S*ee Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005) ("Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action."). Following the resolution of Defendants' Motion to Dismiss, the only remaining claims are retaliation claims

against Drexel, Kurtz, and Brown that are premised on the conversion of Piety Foley's Spring 2025 upper-level Philosophy of Religion seminar ("PHIL 391") from face-to-face instruction to a remote, online-asynchronous format.  Drexel, Kurtz, and Brown now move pursuant to Federal Rule of Civil Procedure 56, Fed. R. Civ. P. 56, for summary judgment on those claims.

## I.    DISCUSSION

Summary judgment is appropriate if the moving party shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"A disputed fact is 'material' if it would affect the outcome of the suit as determined by the substantive law," *Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 771 (3d Cir. 2009) (citation omitted), and an issue of material fact is "genuine," and thus warrants trial, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248-49, 252.  Motions for summary judgment are evaluated with the facts viewed in the light most favorable to the nonmoving party, and any reasonable inferences must be made in that party's favor.  *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

The initial burden of demonstrating the absence of a genuine dispute of material fact lies with the moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The non-moving party must then present affirmative evidence from which a reasonable trier of fact could return a verdict in its favor.  *Anderson*, 477 U.S. at 257.

Importantly, the summary judgment "standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." *Stewart v. Rutgers, The State Univ.*, 120 F.3d 426, 431 (3d Cir. 1997) (citation and internal quotation marks omitted). Indeed, the Third Circuit has advised that "[s]ummary judgment is to be used sparingly in employment discrimination cases." *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 369 (3d Cir. 2008).

In the Third Circuit, retaliation claims under the FLSA and Title IX are both analyzed under the Title VII retaliation framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See Cononie v. Allegheny Gen. Hosp.*, 29 F. App'x 94, 95 (3d Cir. 2002) ("The appropriate framework for analyzing claims of unlawful retaliation under the FLSA is the familiar burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*"); *Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 564 (3d Cir. 2017) ("Title VII's familiar retaliation framework generally governs Title IX retaliation claims." (internal quotation marks omitted)); *see also Carlson v. Qualtek Wireless, LLC*, 2023 WL 5094566, at *3 (3d Cir. Aug. 9, 2023) (joining other courts of appeals in applying the Title VII framework to an FLSA claim based on retaliation for asserting rights under the EPA). Under that framework, the plaintiff must first establish a prima facie case. *C.A.R.S. Protection Plus, Inc.*, 527 F.3d at 364. If she does so, the burden of production shifts to the employer to articulate a legitimate, nonretaliatory reason for the challenged employment action. *Id.* If the employer satisfies that burden, the plaintiff may defeat summary judgment by identifying evidence from which a reasonable jury could find that the employer's stated reason was pretextual. *Id.*

### A.  All Defendants

#### i.    *Prima Facie*

Defendants argue that on the record before the Court Piety Foley cannot establish a prima facie case of retaliation.  "To state a prima facie case of retaliation, a plaintiff must show that (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal connection between the participation in the protected activity and the adverse action."  *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017).  Defendants do not dispute that Piety Foley engaged in activity protected by Title IX when she filed internal complaints of sex discrimination with Drexel in 2020 and 2021, and that she engaged in activity protected by both Title IX and the Equal Pay Act when she commenced *Piety Foley I* in May 2022.  They contend, however, that summary judgment is appropriate because the record cannot support a finding in her favor on either the second or third element.

#### a.   Adverse Employment Action

Defendants first argue that "there is no genuine dispute of material fact that the scheduling of Plaintiff's spring 2025 courses was not a materially adverse action."  More specifically, they contend that no reasonable jury evaluating the scheduling of those courses "could conclude that the Defendants subjected Plaintiff to a materially adverse action that would dissuade a reasonable worker from engaging in protected activity."

Antiretaliation provisions "protect[] an individual not from all retaliation, but from retaliation that produces an injury or harm."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) (emphasis added).  The challenged action must be "materially adverse" — that is, sufficiently harmful that it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id*. at 68.  By contrast, "petty slights or minor annoyances that often take place at work and that all employees experience" are not actionable.

*Id.*

Defendants cite several out-of-circuit decisions for the proposition that a teacher's dissatisfaction with a course assignment ordinarily does not constitute a materially adverse action, even when the teacher would have preferred to teach different courses or was assigned classes at inconvenient times. *See*, *e.g.*, *Recio v. Creighton Univ.*, 521 F.3d 934, 940 (8th Cir. 2008) ("The mere fact that [employer] disallowed [employee] from maintaining her preferred teaching schedule, without any indication that [employee] suffered a material disadvantage as a result of the action, does not meet the significant harm standard set forth in *Burlington Northern.*") (internal quotation marks omitted); *Nolan v. St. Johns Cnty. Sch. Bd.*, 759 F. Supp.3d 1215, 1225 n.19, 1226-27 (M.D. Fla. 2024) ("[I]t is not clear the schedule change at issue here is an adverse employment action. Class schedules for teachers change every year and such assignments are clearly within the discretion of the employer."). But the Third Circuit has recognized that "[a]ssigning an employee to an undesirable schedule can be more than a 'trivial' or minor change in the employee's working conditions" and thus may constitute a materially adverse action, particularly where the employee's "terms, conditions, or privileges of employment were altered." *See Mondzelewski v. Pathmark Stores, Inc.*, 162 F.3d 778, 788 (3d Cir. 1998); *see also Gowran v. Pittston Area Sch. Dist.*, 2024 WL 4643101, at *3 (M.D. Pa. Oct. 31, 2024) ("Even a mere schedule change to weekend work can qualify as an adverse employment action."); *Williams v. Inspira Health Network*, 2023 WL 7151222, at *17 (D.N.J. Oct. 31, 2023) ("Schedule changes have sometimes been held to be adverse employment actions.").

Piety Foley contends that the conversion of PHIL 391 to a remote, online-asynchronous format was not a mere schedule change, but instead substantially altered the nature and

conditions of her work.  In a sworn declaration, she states[1] that "[r]emote online asynchronous courses [are] significantly harder, and significantly less fulfilling, to teach" because they "involve no real-time interaction between the students and the instructor [or] amongst the students themselves," resulting in "lower student engagement."  Maintaining student engagement, motivation, and accountability therefore requires "more time and effort" from the instructor.  Although asynchronous courses may include online discussion forums, Piety Foley explains that those forums are "substantially different from live face-to-face class discussions," in which students receive immediate feedback and "get carried along with the tide of the development of ideas and insights into the problems whose depths they are plumbing."  By contrast, she has spent ten or fifteen minutes responding to a single student's discussion post, such that online discussions may require "three or four hours of the instructor's time to accomplish what can be accomplished in an hour, or an hour and twenty minutes, in a traditional face-to-face class."  Prerecording lectures is likewise "very time-consuming," requires "far more preparation than a standard discussion-based class," and ordinarily must be completed well before the beginning of the term.  Piety Foley further states that "most faculty are themselves less enthusiastic about teaching online asynchronous courses than they are about teaching traditional face-to-face course[s]," and identifies at least one faculty member, Andrew Smith, who refused to teach in that format.  The burdens Piety Foley describes are the types of practical

---

[1] Defendants argue that Piety Foley's declaration is not based on "personal knowledge" and instead offers "broad pronouncements regarding the effectiveness or lack thereof of online instruction in general" that amount to speculation.  Fed. R. Civ. P. 56(c)(4); *Davis v. Harlow*, 2014 WL 4250382, at *7 (W.D. Pa. Aug. 26, 2014), *aff'd*, 632 F. App'x 687 (3d Cir. 2015) ("Speculation is not a substitute for personal knowledge, and conclusory assertions on summary judgment, even sworn to, are insufficient to create a genuine issue of material fact.").  Piety Foley's declaration, however, expressly states that its assertions are "based on facts known personally to [her]" and that the differences she identifies between traditional face-to-face courses and remote online-asynchronous courses "reflect [her] own experience."  That experience includes more than twenty-five years as a professor at Drexel and teaching courses in both face-to-face and online formats.

disadvantages courts have found sufficient to support a materially adverse action. *See Burlington Northern*, 548 U.S. at 71 (finding that the "reassignment of job duties is not automatically actionable," but transfer from a position that was "objectively considered a better job" to a position that was "by all accounts more arduous and dirtier" can be an adverse employment action); *Mondzelewski*, 162 F.3d at 787 (holding that evidence that employees regarded the schedule the employee was given as a "punishment shift" was "sufficient to raise a triable question").

Piety Foley also points to deposition testimony of Brown where he acknowledged that changes to course formats and faculty schedules could be used retaliatorily, particularly when "classes are completely switched at the last minute." That is precisely what Piety Foley alleges occurred here: PHIL 391 was converted to a remote, online-asynchronous format fewer than two months before the Spring 2025 term began. Accordingly, the evidence would permit a reasonable jury to find that converting PHIL 391 did not merely interfere with Piety Foley's preferred method of teaching but increased her workload and assigned her an objectively less desirable form of instruction.

### b. Causation

Second, Defendants argue that Piety Foley's retaliation claims fail because the record cannot support a finding of causation. Central to that argument is a factual dispute over when PHIL 391 was converted from in-person instruction to an online-asynchronous format.

According to Defendants, Amato circulated the change to the Philosophy Department's course schedule for the upcoming academic year to the entire Philosophy faculty more than six months before the trial in *Piety Foley I*. Piety Foley counters that the change was made only after the jury returned its verdict in that action and that she first learned of it within two weeks of that verdict. If resolved in Piety Foley's favor, the close temporal proximity between the verdict

and the change to PHIL 391 could support an inference of causation sufficient to establish a

prima facie case. *See Foley v. Drexel Univ.*, 2025 WL 2346874, at *9 (E.D. Pa. Aug. 13, 2025);

*see also Kachmar v. SunGard Data Sys.*, 109 F.3d 173, 177 (3d Cir. 1997) (explaining that

temporal proximity "is an obvious method by which a plaintiff can proffer circumstantial

evidence" supporting an inference that the protected activity was the likely reason for the adverse

action); *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 307 (3d Cir. 2012)

(explaining that, where the temporal proximity between the protected activity and the adverse

action is "unduly suggestive," it may be sufficient, standing alone, to establish an inference of

causation and defeat summary judgment).

Defendants' chronology of events is as follows:

- **May 9, 2024**.  Peter Amato, the Director of the Philosophy Program, circulated "Version 2" of the teaching schedule for the 2024-2025 academic year.  That version listed Piety Foley as teaching PHIL 391 in person during the Spring 2025 term.

- **June 7 and 11, 2024**.  Drexel Provost Paul Jensen emailed the deans of Drexel's colleges, including Brown, directing them to make immediate and "aggressive changes" to course offerings for the 2024-25 academic year to reduce instructional costs.  Jensen identified twelve measures for achieving that objective, including reducing or eliminating certain courses, exploring "other instructional modality options to assist with schedule flexibility," and taking steps to "achieve higher enrollments per section."  On June 11, Brown forwarded Jensen's email to the CoAS department heads, including Kurtz.

- **June 20 or 21 and June 24, 2024**.  Kurtz met with Jacqueline Rios, CoAS's Associate Director of Instructional Support, to discuss the teaching schedules for the programs within his department.  Rios's responsibilities included assisting most CoAS programs with course scheduling.  On June 24, she emailed Kurtz and asked him to "[p]lease see the attached PHIL recommendations."  The document produced by Defendants as the attachment "strongly advised" that PHIL 391 be changed to an online format.

- **June 26, 2024**. Kurtz emailed Amato in preparation for a meeting scheduled for the following day.  The email listed Kurtz's recommended revisions to the Philosophy teaching schedule, including the instruction: "Change PHIL 391 to ONL."

- **June 28, 2024**.  Following their meeting, Kurtz emailed Rios, copying Amato and Kurtz's administrative assistant, Elizabeth Heenan, to communicate the revisions that he and Amato proposed in response to Rios's recommendations.  The email's discussion of

the Spring term was limited to the following:

> In the Spring term, we wish to retain PHIL 201 and PHIL 241 for various reasons. We have suggested 2 other courses that can be cut instead. We are aware that we need to be prepared to cut PHIL 241 as well, if enrollments are low for that course.

The email also referred to an attached spreadsheet in which the proposed "changes [were] marked in red." The spreadsheet produced by Defendants includes, among those changes, the conversion of PHIL 391 to an online format.

- **June 30, 2024**. Amato also emailed Rios, copying Kurtz and Heenan, to describe the changes that he and Kurtz proposed. Next to PHIL 391, Amato wrote: "Please change this section to online asynchronous."

- **July 22, 2024**. Amato emailed the Philosophy faculty a link to a PDF identified as "Version 4.2" of the teaching schedule. Defendants maintain the document they identify as the PDF available through the link lists PHIL 391 as "Online-Asynchronous." Piety Foley responded: "Looks good, Pete. Thanks so much!"

Piety Foley challenges Defendants' chronology on several grounds. First, she identifies irregularities in the documents on which Defendants rely. Second, she points to later communications that, in her view, contradict Defendants' contention that PHIL 391 had been converted to an online format by July 2024. Third, she identifies differing explanations offered after she discovered the change.

As to the documentary record, Piety Foley first disputes whether the document Defendants identify as the attachment to Rios's June 24 email was, in fact, attached to that message. She notes that the body of the email specifically identifies certain recommended changes but says nothing about PHIL 391. According to Piety Foley, that omission supports an inference that the document Defendants now identify as the attachment was not the document to which Rios referred.

Piety Foley next challenges the authenticity of Kurtz's June 26 email to Amato. She observes that the bullet point accompanying the instruction to change PHIL 391 is hollow,

whereas the remaining bullet points for other instructions are solid.  In her view, that formatting discrepancy supports an inference that the instruction was added later by someone who "either did not notice the difference in the style of the bullet points or did not know how to make the styles match."

Piety Foley similarly disputes whether the spreadsheet Defendants produced was actually attached to Kurtz's June 28 email.  She emphasizes that the body of that email does not mention PHIL 391 or any proposed change to the instructional modality of any course.

She also challenges the reliability of Amato's June 30 email to Rios.  The record contains two copies of that message bearing different timestamps.  One indicates that Amato sent the email at 7:28 p.m.  The other appears in an email chain that Rios sent to Amato on February 13, 2025, after Amato requested a "history of changes" to PHIL 391.  In that chain, the same message is timestamped June 30, 2024, at 3:28 p.m.—four hours earlier.

Finally, Piety Foley challenges whether the document Defendants produced was the same document originally accessible through the link in Amato's July 22 email.  She contends that a different version of the schedule may later have been substituted and notes that the link was inactive for some period of time.  Defendants respond that the PDF's metadata indicates that the document had not been modified since July 22, 2024.  Piety Foley challenges the reliability of that evidence, maintaining that metadata can be manipulated.  She also testified that she believed she had opened and reviewed the schedule because she could not "conceive of saying it looks good" without having looked at it.  She does not, however, recall seeing PHIL 391 listed as an online-asynchronous course at that time.

Defendants characterize these challenges as unsupported speculation insufficient to create a genuine dispute of fact.  *See Walthour v. Miller*, 795 F. Supp.2d 317, 321 (E.D. Pa. 2011) ("In

responding to a motion for summary judgment, a party may not 'just spout unsupported allegations regarding the authenticity of Defendant's exhibits.'") (citing *Monarch Life Ins. Co. v. Estate of Tarone*, 2010 WL 331703, at *3, n.8 (E.D. Pa.2010)).  In *Walthour*, the court rejected the plaintiff's contention that the defendant had relied on "manipulated paperwork" because the plaintiff offered "no evidence to prove that the documents were manipulated or are not authentic."  *Id.*; *see also Roberts v. GHS-Osteopathic Inc.-Parkview Hosp.*, 1997 WL 338868, at *7 (E.D. Pa. June 19, 1997) ("A plaintiff may not avert summary judgment merely by expressing a belief that damaging documents are forged or fake.").

This case, however, presents more than a bare assertion that Defendants' documents were fabricated.  Piety Foley has identified "concrete evidence in the record" supporting her challenge.  *See Orsatti v. New Jersey State Police,* 71 F.3d 480, 484 (3d Cir. 1995).  Specifically, she points to omissions in the bodies of the contemporaneous emails, an unexplained formatting irregularity, conflicting timestamps,[2] and questions concerning the document originally accessible through the July 2024 hyperlink.  Comparable irregularities are sufficient to create a genuine dispute of material fact.  *See*, *e.g.*, *Pope v. Swanson*, 2009 WL 2507928, at *2 (D. Del. Aug. 17, 2009) (denying summary judgment where the parties disputed whether a termination letter bearing a date preceding the supervisor's meeting with the employee reflected a clerical error or showed that the decision to terminate the employee had already been made); *Kaminsky v. Adecco, USA, Inc.*, 2012 WL 2089688, at *2 (W.D. Pa. June 8, 2012) (holding that "[w]hether Plaintiff sent the e-mails is a question of material fact that should be left up to the jury, and is not

---

[2] Defendants assert in their briefing that the conflicting timestamps resulted from differences in time zones.  They identify no record evidence supporting that explanation, however, and factual assertions in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion."  *See Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109-10 (3d Cir. 1985).

a question that should be resolved during the summary judgment phase," where plaintiff proffered evidence "in support of her theory that the e-mails in question were doctored to either change the sender, the content of the e-mails, or both.").

Moreover, Piety Foley's challenge does not rest on the documentary irregularities alone. She also points to the following communications, which arguably conflict with Defendants' account of a Summer 2024 modality change:

- **September 24, 2024**.  Piety Foley asked Amato which of her courses could be moved to the Summer 2025 term.  Amato responded: "[S]ince 291 is online and 391 is not[,] it is likely that 291 would do better in the summer.  I'll have a look at the spring schedule this weekend and get back to you after that."

- **January 22, 2025**.  Only weeks before Piety Foley alleges to have learned of the disputed change, Amato corrected her when she referred to PHIL 391 as her "dedicated" online course, writing: "I assume that you meant 291 not 391 there at the end."

Both communications are difficult to reconcile with Defendants' contention that PHIL 391 had been designated as online since the previous summer and Piety Foley pairs these communications with evidence that Amato did not consult her before the purported change. According to Piety Foley, Amato "has never made a change to my schedule without consulting [her] individually."

Piety Foley also identifies differing explanations offered after she discovered the change:

- **February 11, 2025**.  Amato emailed Philosophy faculty members, student advisers, and others to encourage enrollment in Spring 2025 courses. The email listed Piety Foley's PHIL 391 course as online. According to Piety Foley, this was the first time she learned of the modality change. She responded that PHIL 391 "is not supposed to be online" and asserted that "[i]t has never been online."  When Piety Foley objected, Amato responded that he "didn't do it on purpose," that he "thought that's what [she] wanted," and that the change was his mistake.

- **February 12, 2025**.  Kurtz told Piety Foley that PHIL 391 needed to be taught online and that he had "double checked this issue with the dean's office, who are the ones wanting it to be online in the first place."

Also that day, in response to another professor's question about a different modality

change, Amato wrote that the "same thing[] happened with [Piety Foley's] schedule" and that "[s]omewhere between me and the college, spring sections that were fully face-to-face got changed to either fully online or hybrid." Amato sent that message after speaking with Kurtz, who had reviewed the matter with him and told him that "he had done things correctly." Yet neither Kurtz nor Amato initially told Piety Foley that the change had been made the previous summer or that she had agreed to it.

In sum, this is not a case in which a party attempts to avoid summary judgment merely by declaring that unfavorable documents must be fake. Piety Foley has identified specific irregularities in the documents themselves, contemporaneous communications arguably inconsistent with Defendants' chronology, and shifting explanations concerning how and why the course was changed. Whether those inconsistencies establish alteration, mistake, or some other explanation depends on "a matter of credibility, which is inappropriate for the court to determine at the summary judgment phase." See Pope, 2009 WL 2507928, at *2. Accordingly, a genuine dispute remains as to when PHIL 391 was converted to an online-asynchronous format.

### ii.    Pretext

Defendants further argue that, even if Piety Foley could establish a prima facie case of retaliation, they have articulated a legitimate, nonretaliatory reason for the scheduling of her Spring 2025 courses and that no reasonable jury could find either that this justification was pretextual or that retaliation was the but-for cause of the challenged action. See Carvalho-Grevious, 851 F.3d at 257 ("The onus is on the plaintiff to establish causation at two stages of the case: initially, to demonstrate a causal connection as part of the prima facie case, and at the final stage of the McDonnell Douglas framework to satisfy her ultimate burden of persuasion by proving pretext.").

According to Defendants, PHIL 391 was converted to an online-asynchronous format as part of the broader, University-wide effort to reduce instructional costs. They maintain that the

conversion was one of several scheduling revisions made in response to the provost's directive to make immediate and "aggressive changes" to course offerings for the 2024–2025 academic year and was based on enrollment data showing that the affected courses historically attracted more students when offered online.  This explanation satisfies Defendants' burden of articulating a legitimate, nonretaliatory reason for the modality change.  *See Erb v. Borough of Catawissa*, 749 F. Supp.2d 244, 257 (M.D. Pa. 2010) ("It is the burden of production, not of persuasion, that shifts to the employer at the second stage of the *McDonnell Douglas* framework.") (citing *Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009)).

The question, then, is whether Piety Foley has identified evidence from which a reasonable jury could find that Defendants' explanation is pretextual.  To meet that burden, she "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably . . . disbelieve the employer's articulated legitimate reasons."  *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).  She may do so by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in those reasons that a reasonable factfinder could find them "unworthy of credence."  *Id*. at 765.

Piety Foley has met that burden.  Defendants' lack of pretext argument rests substantially on the premise that PHIL 391 was converted to an online format during the Summer 2024 scheduling process, alongside the other department-wide changes undertaken in response to the Provost's directive.  As explained, however, the record presents a genuine dispute as to whether the change was made during that process or only after the verdict in *Piety Foley I*.  If a jury finds that PHIL 391 remained an in-person course until after the verdict in *Piety Foley I*, it could reasonably reject Defendants' contention that the change was merely one component of the Summer 2024 cost-saving initiative.  A change made months after the other scheduling

revisions—and shortly after Piety Foley prevailed at trial—would not fit comfortably within Defendants' asserted chronology and could support a finding that the proffered explanation was not the true reason for the action.  Moreover, the timing of an employment decision may support such a finding at the pretext stage.  *See Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 311-12 (3d Cir. 2012) (concluding that "the timing of [the employer's] decision could lead a fact finder to infer that [the plaintiff] would not have been fired absent her taking of leave").  To be sure, temporal proximity does not invariably establish pretext where the undisputed record otherwise demonstrates that the employer acted for legitimate reasons.  *See Kluender v. United States Liab. Ins. Co.*, 2025 WL 886949, at *7 (E.D. Pa. Mar. 21, 2025), *aff'd*, 2026 WL 674215 (3d Cir. Mar. 10, 2026) ("There is more than sufficient undisputed factual evidence on the record to show that Defendant's legitimate non-discriminatory reason for terminating Plaintiff was not pretextual, irrespective of the temporal proximity of the protected activity and the termination.").  Here, however, the timing of the modality change is itself disputed, and that dispute bears directly on whether Defendants' asserted justification is credible.

The timing dispute is therefore material at both stages of the causation analysis.  If resolved in Piety Foley's favor, it could establish the close temporal proximity necessary to support her prima facie case and undermine the factual premise of Defendants' proffered nonretaliatory explanation.  Because that dispute must be resolved by a factfinder, Defendants are not entitled to summary judgment on the ground that Piety Foley cannot establish pretext.

### B.  Defendant Brown

Lastly, Defendants argue that Brown is entitled to summary judgment because no record evidence shows that he participated in, or was responsible for, the decisions concerning Piety Foley's Spring 2025 course schedule.

A company's owners, officers, or supervisory personnel may be held individually liable under the FLSA where the individual exercised "supervisory authority over the complaining employee and was responsible in whole or part for the alleged violation while acting in the employer's interest." *Thompson v. Real Est. Mortg. Network*, 748 F.3d 142, 153 (3d Cir. 2014) (quoting *Haybarger v. Lawrence Cnty. Adult Prob. & Parole*, 667 F.3d 408, 417 (3d Cir. 2012)).

When questioned about Brown's involvement in the modality change, Kurtz testified that he did not know whether Brown had been involved. Although the initial recommendation came from Rios, CoAS's Associate Director of Instructional Support who assisted most CoAS programs with course scheduling, Kurtz did not know whether Brown had suggested the change to her. Brown, for his part, testified that he did not participate in the decision to change the format of PHIL 391 and did not know who had made that decision. According to Brown, decisions concerning course modality were not matters in which he ordinarily participated.

The record, however, contains evidence that could support a contrary inference. First, Brown testified that Kurtz gave him a "heads up" that "something [may be] coming [his] way with respect to . . . two online courses that involved Professor Piety." Kurtz similarly testified that he wanted to give Brown "a heads up that this was . . . something we were talking about and that might come across his desk." In addition, on February 12, 2025, Kurtz told Piety Foley that PHIL 391 needed to be taught online and that he had "double checked this issue with the dean's office, who are the ones wanting it to be online in the first place." When questioned about Kurtz's statement, Brown testified only that he did not know the circumstances surrounding it.

Kurtz's contemporaneous statement expressly attributes the decision to require PHIL 391 to be taught online to the dean's office, which Brown headed. His testimony that he gave Brown a "heads up" because the issue might "come across his desk" further suggests that Brown

possessed authority over, or could become involved in, the scheduling decision.  Although this evidence does not establish Brown's personal involvement conclusively, it creates a genuine issue of material fact as to Brown's involvement in the challenged action.  Accordingly, Brown is not entitled to summary judgment on the ground that he had no involvement in the decision concerning PHIL 391.

An appropriate order follows.


BY THE COURT:


___S/ Wendy Beetlestone_____
**WENDY BEETLESTONE, C.J.**